UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

MARTHA CARLSON,

Plaintiff,

v. Case No. 26-cv-19-jdp

WISCONSIN DEPARTMENT OF ADMINISTRATION,
DIVISION OF HEARINGS AND APPEALS,

Defendant.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, Martha Carlson, through her attorneys, Alan C. Olson & Associates, S.C., by Nicholas O. Yurk, provides this Brief in Opposition to Defendant's Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.

## FACTS

The facts of this case are contained in Plaintiff's Proposed Findings of Fact ("PPFOF"), the Declaration of Martha Carlson, the Declaration of Nicholas O. Yurk, Plaintiff's Response to Defendant's Proposed Findings of Fact, and, to the extent undisputed, Defendant's Proposed Findings of Fact ("DPFOF").

## ARGUMENT

Defendant argues that summary judgment should be granted on three bases. First, Defendant argues that it reasonably accommodated Carlson because her doctors "recommended" that she work remotely rather than "restricted" her ability to perform work in person, and because Carlson supposedly caused the breakdown of the interactive process by declining to arrange an unrecorded phone call between Defendant's human resources coordinator and her physician. Second, Defendant argues that Carlson suffered

no adverse employment action, relying on a line of "tangible job consequence" cases that the Supreme Court rejected in *Muldrow v. City of St. Louis*. Third, Defendant argues that Carlson cannot prove retaliation because she suffered no adverse action, and alternatively that the Rehabilitation Act does not permit retaliation claims at all, despite the statute's express incorporation of the ADA's anti-retaliation provision.

Each argument depends on Defendant's version of disputed facts. Carlson's physician circled "Yes" when asked whether her restriction from working outside the home was permanent and applied to all work hours, and later circled "Yes" to whether she was medically restricted from working outside her home and wrote that the restriction was permanent. Carlson relayed Defendant's request to speak with her doctor and asked Defendant to send her doctor any further questions in writing. Defendant's own emails show that management rejected Carlson's proposed compromise the same day she made it, before its own HR coordinator had obtained the additional medical information she asked for time to gather, and that Carlson's managers had discussed denial before the process concluded. Defendant then denied her request in a two-paragraph letter that treated it as a request for an exception to the telework policy "due to exceptional personal reasons," gave no reason, and violated Defendant's own policy requiring a detailed explanation for every denial. Defendant has now allowed Carlson to work from home full time since February 2024, during which time her productivity has risen to its highest level since 2018. A jury could readily conclude that full-time telework was a reasonable accommodation available to Defendant in 2021, and that Defendant, not Carlson, was responsible for the breakdown that led to its denial. A jury could likewise conclude that Defendant subjected Carlson to forced leave, investigation, and a letter threatening termination because of her disabilities and her complaints.

## I. The Summary Judgment Standard

Summary judgment is only appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate that there is no genuine issue of material fact and

that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine and thus defeats a summary judgment motion if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When a party's summary judgment motion is reviewed, the Court views all facts and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. The evidence must be considered as a whole. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

## II. A Reasonable Jury Could Find That Defendant Failed to Reasonably Accommodate Carlson.

Defendant does not dispute that Carlson is a qualified individual with a disability or that Defendant knew of her disabilities. Defendant's argument is limited to the third element—whether Defendant failed to reasonably accommodate Carlson. (Dkt. 29 at 19–27.) An employer discriminates when it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless it "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). A reasonable accommodation expressly includes "job restructuring" and "part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). As Defendant concedes, undue hardship is Defendant's burden. (Dkt. 29 at 19.)

The employer and employee must engage in an interactive process to identify an appropriate accommodation, and an employer is liable when it bears responsibility for the breakdown of that process. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). Responsibility for a breakdown is determined by looking "for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Defendant cites no authority for its assertion that the Court may assign responsibility for the breakdown as a matter of law on a record like this one, and the Seventh Circuit reversed summary judgment because a reasonable jury could have found the employer responsible under similar circumstances. *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d at 806–08.

**A. Remote work was a reasonable accommodation.**

Defendant's threshold argument is that in-person attendance is an essential function of Carlson's job, so remote work could not be a reasonable accommodation. (Dkt. 29 at 21–23.) Whether a function is essential is a question of fact, determined by considering the employer's judgment, written job descriptions, the consequences of not requiring the function, and the work experience of employees in the same position. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3); *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 197–99 (7th Cir. 2011). The employer's judgment is considered but is not given complete deference. *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687–88 (7th Cir. 2020). Defendant's own authorities recognize that, after the pandemic, whether in-person work is essential "has become much more of a case-specific inquiry." *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 644 (7th Cir. 2023); *see also Smithson v. Austin*, 86 F.4th 815, 822 (7th Cir. 2023).

Every objective factor favors Carlson's position that in-person work was not essential to her position. Carlson's position description lists conducting hearings, issuing decisions, and other legal duties—it expressly contemplates video-conference and

telephonic hearings, and does not identify working from a DHA office as a duty. (PPFOF ¶¶ 1–3.) Corrections hearings have been conducted by video since March 2020, and DHA's own return-to-office plan requires General Government and Worker's Compensation hearings, but not Corrections hearings, to be conducted from a state office building. (PPFOF ¶¶ 4, 9.) The State Office Building's internet connection was frequently problematic when ALJs worked in person, at times requiring hearings to be rescheduled, while Carlson recalls at most one connectivity problem working from home. (PPFOF ¶¶ 5, 6.) Carlson issued more decisions in 2020, when she worked entirely from home, than she did in 2019, when she worked in the office. (PPFOF ¶¶ 11, 12.) DéFort's own evaluation of that remote period, signed the same day he and Hayes agreed to deny her request, rated Carlson "Excellent" in every competency, described her as "one of the more productive Corrections unit judges across the entire division," and praised her for "flexibly and capably adapting to a full video hearing calendar." (PPFOF ¶ 15.) Her output fell in 2022—the year she was returned to the office—and has risen in 2024 and 2025, after Defendant finally approved full-time telework. (PPFOF ¶¶ 13, 14.) Hayes himself told staff in May 2021 that DHA had met its caseloads and provided due process throughout the pandemic. (PPFOF ¶ 7.)

Most significantly, Defendant has allowed Carlson to work from home full time since February 20, 2024, conducting all of her hearings by video, subject to the same work and performance expectations as every other ALJ. (PPFOF ¶¶ 14, 18, 24.) Defendant has twice continued that approval after reviewing how well it was working. (PPFOF ¶ 23.) The approval demonstrates that nothing about the position itself requires an ALJ to work from the office. Defendant also allowed ALJ Kelly Cochrane to work from home full time from the beginning in 2020 and continuing until July 2022, not as an accommodation of any disability of her own but because of her husband's health. (PPFOF ¶¶ 26, 27.) An employer cannot credibly claim that in-office attendance is so essential to a position that

no amount of remote work could be accommodated when it has allowed two ALJs in the same position to work remotely full time.

Defendant responds that Cochrane's situation was not comparable because the in-office measures provided to Carlson were "not possible for Cochrane," so temporary remote work was the only option available to her. (Dkt. 29 at 27; DPFOF ¶ 267.) That response misses the point—Cochrane is a relevant comparison not because she and Carlson had the same needs, but because Defendant's treatment of her shows that an ALJ in Carlson's position can perform the job from home full time for an extended period, and Defendant permitted work from home without any legal requirement. Cochrane continued to work successfully from home for roughly a year after Defendant denied Carlson's request. (PPFOF ¶¶ 26, 72.) And DéFort later told DOA's legal counsel that Cochrane's request was approved because it was supported by a "medical restriction issued by a medical provider," even though Cochrane had no disability of her own. (PPFOF ¶¶ 27, 28.) A jury could find that Defendant applied its rules to Carlson in a way it did not apply to an ALJ who had no disability when denying Carlson's requested accommodation.

Defendant's remaining justifications do not concern the essential functions of Carlson's job. Hayes's declaration relies on the burden on support staff, the value of informal collaboration, and the in-person needs of ALJs working in different jobs. (DPFOF ¶¶ 35–44, 276–280.) None of those concerns describes a duty Carlson could not perform from home. Hayes's concern that ALJs working remotely become isolated does not describe Carlson, who has worked from home full time for nearly three years, has regular contact with parties, agents, colleagues, and staff, and does not feel isolated. (PPFOF ¶ 25.) And Hayes's ultimate basis for his belief that full-time remote work would be an undue hardship is that allowing some employees to work from home "can create resentment and undermine DHA's mutually supportive culture." (PPFOF ¶ 146.) The EEOC's interpretive guidance is explicit that undue hardship cannot be established by

showing generalized conclusions such as a fear that an accommodation might have a negative impact on the morale of other employees. 29 C.F.R. pt. 1630, app. § 1630.15(d). Defendant's own HR procedures confirm this—its "Justification of Undue Hardship" form requires the division to provide "a detailed justification of undue hardship" based on "objective criteria," and states that "[s]ubjective criteria cannot be used." (PPFOF ¶ 33.) Defendant has produced no such justification for any of Carlson's requests. (PPFOF ¶ 34.) Pre-pandemic decisions holding that working from home is rarely a required accommodation, *see, e.g.*, *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544–45 (7th Cir. 1995), do not account for the case-specific inquiry *Kinney* and *Smithson* now require, or for the fact that Defendant has proven, through its own practice, that Carlson can perform every function of her job from home.

Further, Carlson did not insist on full-time telework. In June 2021, she proposed conducting her hearings from home Monday through Thursday and reporting to the office every Friday. Friday was the one day of the week on which DHA's plan made in-office attendance mandatory, and Corrections hearings are not normally scheduled on Fridays. (PPFOF ¶¶ 8, 10, 51.) Under DHA's 50% policy, every ALJ already worked from home half the time. (DPFOF ¶¶ 45–46.) Carlson's proposal asked for, at most, one or two additional days at home per week, and preserved the very in-office day DHA had identified as necessary. Defendant has never explained why that proposal was unreasonable. Catlin told Carlson it "could be an undue hardship," without any analysis of hardship at all, yet the same afternoon she asked management to permit exactly that schedule while she gathered more documentation. (PPFOF ¶¶ 52, 53.) Management declined. (PPFOF ¶ 54.) A jury could easily find that remote work, in whole or in substantial part, was reasonable on its face.

### B. Defendant, not Carlson, caused the breakdown of the interactive process in 2021.

Defendant's central argument in defense of its failure to accommodate Carlson is that Carlson's medical documentation "recommended" Carlson perform remote work but did not "restrict" Carlson to performing remote work, and that Carlson caused the breakdown by not arranging a phone call between Catlin and Dr. Taylor. (Dkt. 29 at 23–24.) Both premises are contradicted by the record.

#### *i. The medical documentation supported Carlson's request.*

Defendant's distinction between a "recommendation" and a "restriction" appears nowhere in the ADA, the Rehabilitation Act, or Defendant's own accommodation policy. Policy #402 permits a request to be denied only for undue hardship, an inability to perform essential functions even with the accommodation, or a work rule or direct-threat concern; it says nothing about a provider's "restriction" as opposed to a "recommendation." (PPFOF ¶¶ 31, 32.) An employer may request medical documentation sufficient to establish the disability and the need for accommodation, but it may not invent a heightened standard of medical proof and then deny an accommodation because the provider used the wrong word. Defendant applied no such standard in 2023, when it granted in-office accommodations based on Dr. Taylor's recommendations. (DPFOF ¶¶ 222–225.)

Regardless, Dr. Taylor's documentation did restrict Carlson from working outside her home. In his first Medical Inquiry, Dr. Taylor identified chronic migraine and chronic low back pain as impairments substantially limiting the major life activity of working; identified fluorescent light and strong scents as triggers; and circled "Yes" to whether Carlson's restriction from working outside the home was permanent and whether it applied to all work hours, questions that are answered only "[i]f Yes." (PPFOF ¶¶ 40–43.) Carlson pointed this out to Catlin the same day Catlin claimed that Dr. Taylor had not restricted her. (PPFOF ¶ 44.) In his July 7, 2021 response, Dr. Taylor circled "Yes" to

whether Carlson was medically restricted from working outside of her home, wrote that the restriction would last "permanently," attributed it to "worsening migraines throughout work place," and answered "Yes" to whether her migraines rise to the level of a disability under the ADA. (PPFOF ¶ 59.) The July 19 questionnaire, which Dr. Taylor signed, again answered that Carlson was permanently restricted from working outside her home 100% of the time because of fluorescent-light and odor-induced migraines. (PPFOF ¶ 60.) Defendant asserts that a member of the clinic's disability staff, rather than Dr. Taylor, circled that answer. (DPFOF ¶ 103.) But on the same form, in his own handwriting, Dr. Taylor wrote that he "recommend[s] she not work in office as per the previous medical reasons." (PPFOF ¶ 61.) Whatever label Defendant attaches to that statement, its meaning was clear—Carlson's physician did not want her working in the office.

Defendant characterizes Dr. Taylor's statement that "patient can work in office on Fridays" as a contradiction. (Dkt. 29 at 10.) It was not. Catlin's own letter asked Dr. Taylor to identify an in-office schedule because Carlson had "agreed to work from the office 1 day per week" as "part of the interactive process," and Carlson had discussed that proposal with Dr. Taylor before he answered. (PPFOF ¶¶ 57–59.) A physician who confirms that his patient can tolerate the compromise she offered her employer is not contradicting himself; he is participating in the interactive process as the employer asked. And when Catlin asked him about the statement, Dr. Taylor answered that it "was an error" and that he recommended Carlson not work in the office for the reasons he had already given. (PPFOF ¶ 61.) Any ambiguity Defendant perceived was resolved by July 19. (PPFOF ¶¶ 60, 61.) Catlin's earlier response, that if Carlson were restricted she "would not be able to come into the office at any time," penalized Carlson for offering a compromise. (PPFOF ¶ 52.) And Catlin's July 30 email confirms that the medical semantics were beside the point: even if Carlson was "truly restricted," Catlin explained,

the next step would be "going down the route of 'undue hardship' with management." (PPFOF ¶ 63.)

***ii. Carlson facilitated communication with her doctor.***

Defendant's claim that Carlson "refused to allow her doctor to have a conversation with Catlin" is not supported by the record. (Dkt. 29 at 23–24.) On August 6, 2021, Carlson emailed Catlin that she had contacted her doctor's office and relayed Catlin's request to speak with her physician. (PPFOF ¶ 64.) Carlson's only objection was to an unrecorded telephone conversation between Catlin and Dr. Taylor without her being included—she did not object to further written questions and asked why another, more specific questionnaire could not be sent. (PPFOF ¶ 65.) That is a reasonable request for any employee, and particularly for one whose employer had already characterized her physician's written answers as contradictory. Carlson has no control over whether her physician returns a call. (PPFOF ¶ 66.) Dr. Taylor's office declined to complete a fourth form because his office had already completed three, and stated that his last form "will be final and that is what applies." (PPFOF ¶ 68.)

An employee does not cause a breakdown when her doctor, after answering three rounds of questionnaires, declines to answer a fourth. Further, an employer that receives documentation it considers unclear cannot simply deny the request; it must take reasonable steps to clarify. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285–86 (7th Cir. 1996). Defendant did not seek an independent medical opinion or meet with Carlson to discuss alternatives. It sent a fourth questionnaire on August 10, 2021 with a response date of August 17, denied Carlson's request three days later, and did not change course when Dr. Taylor answered that questionnaire in October by again stating that Carlson should not work in an office setting. (PPFOF ¶¶ 67, 72, 75–77.) Defendant later told the EEOC that "[t]he reason for the denial was that her provider indicated that it is only recommended that she work from home, rather than her being restricted from working outside the home." (PPFOF ¶ 76.)

***iii. Management decided the outcome before the process was complete.***

Defendant's internal communications confirm that the denial was not the product of a breakdown caused by Carlson. On June 28, 2021, the same day Carlson proposed working in the office on Fridays, DéFort told Catlin that he had consulted with Hayes and that "we are declining her counter offer." (PPFOF ¶ 54.) That decision rejected a request from Defendant's own accommodation coordinator, who had asked two hours earlier whether management would "be willing to permit Martha to work from home M-TH and work in the office on Fridays" while she obtained more information. (PPFOF ¶ 53.) When management declined, Catlin responded that she "can respect the decision by yourself and Administrator Hayes," but asked them to "reconsider, briefly, and allow a 30 day exception" so she could obtain more medical documentation. (PPFOF ¶ 56.) The follow-up questionnaires Defendant now characterizes as a good-faith effort to clarify Carlson's needs were sent after management had already rejected her compromise. An employer that decides the outcome first and gathers documentation afterward has not engaged in the interactive process in good faith. *See Beck*, 75 F.3d at 1135.

***iv. Defendant's denial letter confirms that it did not treat Carlson's request as a request for accommodation.***

The August 20, 2021 denial letter does not reference Carlson's disabilities, her medical documentation, undue hardship, or the essential functions of her job. (PPFOF ¶ 73.) It treats Carlson's request as one for "an exemption from, or exception to, your assigned work area's applicable telecommuting policies due to exceptional personal reasons," and says only that the request "is denied at this time." (PPFOF ¶ 72.) Defendant's own policy requires that "[a]ll denials will include a detailed explanation of why the requested accommodation was denied." (PPFOF ¶ 30.) Defendant's explanation in this litigation, that the request was denied because Dr. Taylor and Carlson did not respond to requests for clarification, appears nowhere in the letter. Neither does the reason DéFort gave internally when he approved the letter that morning: "insufficient

reliable evidence of a medical 'restriction.'" (PPFOF ¶ 71.) A jury could reasonably conclude that Defendant never genuinely considered Carlson's request as a disability accommodation, and that its current explanation is a post hoc rationalization. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (employer's failure to follow its own internal procedures can support an inference of pretext).

### C. The in-office measures Defendant relies on were not accommodations and did not address Carlson's limitations.

An accommodation must be effective—the word "accommodation" "conveys the need for effectiveness." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002). Defendant argues that it accommodated Carlson in 2021 by providing her own office where she could turn off the lights, a sit/stand workstation, an ergonomic chair, and the ability to request a footrest. (Dkt. 29 at 24–25.) But the private office, sit/stand workstation, video hearings at her desk, ability to use a lamp, and 50% telework were provided to every ALJ and therefore were not accommodations made for Carlson. (PPFOF ¶ 50.) Further, Carlson could control the lighting only in her own office—the hallways, lobby, common areas, support staff area where she checked her mail and performed administrative tasks, and bathrooms were all lit by fluorescent lights, the very trigger her physician identified. (PPFOF ¶¶ 41, 45, 46.) Defendant never addressed those areas, or the strong scents and odors Dr. Taylor identified as causes of Carlson's difficulties with in-office work. (PPFOF ¶ 41.) Further, DéFort told HR that Carlson already had an ergonomic chair; in fact, her chair had been broken since 2013. (PPFOF ¶¶ 47, 48.) The replacement was the same style of chair, which did not help, and Carlson found a usable chair in the office herself. (PPFOF ¶ 49.)

Carlson's migraines occurred a couple of times per week when she worked in the office and essentially disappeared when she worked from home. (PPFOF ¶ 35.) A jury could find that Defendant's in-office measures were not effective accommodations of Carlson's limitations, and that Defendant's reliance on them was not a good-faith

response to her medical documentation. Defendant's suggestion that the fluorescent lights "were no longer an issue" after the pandemic (Dkt. 29 at 25) relies on testimony that says only that Carlson no longer traveled to correctional institutions. (DPFOF ¶ 360; PPFOF ¶¶ 39, 45, 46.) And Carlson's testimony that she has never looked at the lighting in her grocery store says nothing about whether she can work a full day under fluorescent lights.

Defendant's reliance on *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 681–82 (7th Cir. 2010), does not change this analysis. (Dkt. 29 at 20.) *Gratzl* holds that an employer need not provide the specific accommodation the employee prefers, so long as the accommodation it does provide is reasonable. *Id*. That rule allows an employer to choose among effective accommodations but it does not allow an employer to substitute an ineffective one. Here, the measures Defendant chose did not address the fluorescent lighting outside Carlson's office or the scents and odors her physician identified, and her migraines continued when she worked in the office. (PPFOF ¶¶ 35, 45, 46, 50.) Whether those measures were effective is a question of fact, and *Gratzl* does not answer it.

Further, Dr. Taylor's notation "these are appropriate" on the July 19 questionnaire does not resolve the issue. That notation appears beside a list of the features of Carlson's office, in response to a question asking whether there were "additional accommodations at work that would mitigate any symptoms." (PPFOF ¶ 62.) On the same form, Dr. Taylor wrote that he recommended Carlson not work in the office, and the form stated that she was permanently restricted from working outside her home 100% of the time. (PPFOF ¶¶ 60, 61.) Read as a whole, the form says that the listed features were appropriate but insufficient for Carlson to work in the office. At a minimum, this dispute creates a question for the jury.

### D. Defendant's responses to Carlson's 2022 and 2023 requests were also unreasonable.

Defendant argues that it accommodated Carlson's anxiety and depression in 2022 by permitting temporary telework consistent with Dr. Langley's recommendations. (Dkt. 29 at 25–26.) But Dr. Langley reported that Carlson was not currently able to work outside of her home, that her condition may last twelve months or longer, and that she had "[n]o difficulty performing the full scope of her job responsibilities" by telework or Microsoft Teams. (PPFOF ¶¶ 84–86.) Defendant's argument that Carlson could not perform the essential function of interacting with others (Dkt. 29 at 25–26) is contradicted by that documentation; Dr. Langley explained that interacting with her managers through Teams, email, or telecommunication was substantially less likely to exacerbate her condition. (PPFOF ¶ 87.) *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941 (9th Cir. 2015), involved an employee who threatened to kill his coworkers, and has nothing to say about an ALJ who can perform every function of her job remotely.

Defendant's letters to Dr. Langley stated from the outset that "it may be unreasonable to allow for continued telecommuting beyond the temporary parameters." (PPFOF ¶ 88.) When Dr. Langley responded that the in-office alternatives Defendant proposed "may be helpful if the following concerns can be addressed," and suggested a phased return over three months, Defendant ended Carlson's telework on July 31, 2022 without any phase-in, told her she would have to re-apply for any further accommodation, and described her provider as having "dismissed" Defendant's alternatives. (PPFOF ¶¶ 89–92.) DéFort remained Carlson's supervisor. (PPFOF ¶ 93.) Carlson's output then fell to its lowest level, and she began taking intermittent FMLA leave for flare-ups of her conditions. (PPFOF ¶¶ 13, 95.) A jury could find that a temporary accommodation that ended before the period Carlson's provider said her condition would last, and without the phase-in her provider proposed, was not a reasonable accommodation.

The 2023 request followed the same pattern. On March 24, 2023, Dr. Taylor recommended that Carlson "work from home until further evaluation." (PPFOF ¶ 112.) Catlin now declares that she did not treat that note as an accommodation request, and that Carlson did not follow up. (DPFOF ¶¶ 212–214.) But Carlson wrote to Catlin the next day that she was "hereby requesting to work from home on a full-time basis," and when Catlin responded with a fitness-for-duty form and a question about paid leave, Carlson replied: "To be clear, I am not requesting time off of work." (PPFOF ¶ 113.) At the time, DéFort and Hayes allowed Carlson to work from home so that Catlin could "investigate what seems to be Martha's medical accommodation request (stemming from her doctor's recommendation - dated March 24, 2023)." (PPFOF ¶ 114.) Defendant's policy permits requests to be made by email, and on April 4, 2023 Carlson emailed Hayes and DéFort, copying Catlin, requesting full-time telework because of post-COVID conditions and asking whether she needed to file another form. (PPFOF ¶¶ 29, 116.) The FMLA application Defendant relies on as an accommodation was for a February 9, 2023 absence. (PPFOF ¶ 117.) When Defendant finally sent a questionnaire, it directed Dr. Taylor to address long COVID "only" and suggested that FMLA leave, rather than an accommodation, could address Carlson's needs. (PPFOF ¶ 121.) Further, the result was decided in advance—on April 5, 2023, two months before Defendant sent any accommodation questionnaire to Carlson's providers, Catlin circulated to Hayes and DéFort, "[f]or discussion today," a draft letter denying the request because Carlson's "[m]edical documentation does not establish a 'work restriction'"; the August 2 denial issued four months later contains the same language. (PPFOF ¶¶ 115, 121.) When Carlson submitted her formal request, DéFort told Hayes that it "cites a doctor's recommendation, rather than a restriction – which HR's medical coordinator (Jess Catlin) has previously advised is insufficient." (PPFOF ¶ 118.) Defendant then denied the request because the documentation did not establish a "work restriction." (PPFOF ¶¶ 125, 126.) But Defendant already had a doctor's note which established a restriction. Dr.

Taylor deferred to Dr. Langley, and on July 12, 2023, three weeks before the denial, Dr. Langley told HR that Carlson's limitation would not affect her work "if conducted remotely," recommended "mostly virtual/remote work" for the "[l]ong-term," and wrote: "Limit schedule outside of home to no more than once per week for now but with support of an advocate up to two days." (PPFOF ¶¶ 122–124.) Defendant's letter drew on Dr. Langley's recommendations, listing reduced in-person meetings among the accommodations Carlson's providers had identified, and yet denied her request for lack of a "work restriction." (PPFOF ¶¶ 126, 127.) Defendant's brief describes the August 2, 2023 letter as granting natural lighting, reduced in-person meetings, and breaks. (Dkt. 29 at 17, 26–27.) In fact, the letter denied Carlson's request; it did not grant break time, stating that "more conversation is needed"; her window resulted from her unit's relocation; and reduced in-person meetings were available to any employee without an accommodation. (PPFOF ¶ 127.)

Defendant also argues that approving Carlson's FMLA leave was itself an accommodation, because "time off may be an apt accommodation for intermittent conditions." (Dkt. 29 at 26 (quoting *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)).) Carlson did not ask for time off. She asked to keep working, from home, as her physician recommended. (PPFOF ¶¶ 112–116.) Leave that requires an employee to stop working and use her own accrued time is not a substitute for an accommodation that would allow her to perform her job, and, as noted above, the FMLA application Defendant relies on covered a single absence in February 2023. (PPFOF ¶ 117.) FMLA leave is also a separate statutory entitlement; it does not satisfy, or replace, an employer's duty to accommodate under the ADA. 29 C.F.R. § 825.702(a). *Byrne* does not suggest otherwise.

Carlson suffered a transient global amnesia episode on the morning she was to return to the office under that denial. (PPFOF ¶ 131.) Six months later, after Dr. Baur reported that Carlson was not medically able to work in an office even one day per week,

Defendant approved full-time telework. (PPFOF ¶¶ 18, 21, 22; DPFOF ¶¶ 259–261.) Defendant had received essentially the same information before. In 2021, Dr. Taylor answered that Carlson was permanently restricted from working outside her home, and in December 2021, Dr. Langley reported that she was "not currently able to work outside of her home." (PPFOF ¶¶ 59, 84.) Defendant denied the first request outright and limited the second to a temporary arrangement. (PPFOF ¶¶ 72, 91.) Defendant has continued the 2024 arrangement twice, and Carlson has performed at a higher level throughout: DéFort's own 2024 review rated her "Exceptional" as a Corrections ALJ and reported that she had issued more decisions than thirteen of the fifteen Corrections ALJs in the division. (PPFOF ¶¶ 14, 23, 111.) Defendant offers no evidence that the needs of Carlson's position changed between 2021 and February 2024. On this record, which shows Carlson's accommodation was needed, while in-office work was not required for Carlson to perform at a high level, a jury could find that Defendant failed to reasonably accommodate Carlson.

## III. Carlson Suffered Adverse Employment Actions Because of Her Disabilities.

### A. Defendant applies the wrong standard.

Defendant argues that Carlson's discrimination claim fails because she suffered no adverse employment action, relying on decisions holding that discipline, investigations, and supervisory actions are not actionable without a "tangible job consequence" or a "materially adverse" change in employment. (Dkt. 29 at 28–35 (citing *Barton*, *Grube*, *Whittaker*, *Lucas*, *Lauth*, *Bagwe*, *Poullard*, and *Fuller*).) Those cases pre-date *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), in which the Supreme Court held that an employee challenging a discriminatory change to the terms or conditions of employment need show only "some harm" respecting an identifiable term or condition of employment, and need not show that the harm was "significant," "serious," "substantial," or any similar

heightened standard. *Id.* at 354–55. Under the correct standard, Carlson has identified several adverse actions.

Additionally, Defendant emphasizes that a Section 504 discrimination claim requires proof that the employer acted "solely by reason of" disability. (Dkt. 29 at 27–28 (citing *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021)).) That standard does not defeat Carlson's claim at this stage. Defendant's own documents tie the actions at issue to Carlson's medical conditions. Hayes removed Carlson from work in August 2023 expressly "[b]ased on [her] medical emergency." (PPFOF ¶ 137.) The October 2022 investigation and letter of expectation arose from an absence Carlson recorded as FMLA leave for symptoms of her diagnosed conditions, and from her complaint about being questioned about that leave. (PPFOF ¶¶ 96, 100–105.) The reasons Defendant does offer, such as absence reporting and the tone of Carlson's emails, arose directly from her medical leave and her complaint about how that leave was questioned. Whether disability was the sole reason is a question for the jury. Furthermore, the "solely by reason of" standard also has no application to Carlson's retaliation claim, as Defendant concedes. (Dkt. 29 at 47.)

### B. Defendant forced Carlson to use her own leave because of her medical condition.

After Carlson's August 3, 2023 medical episode, HR told her on the afternoon of August 4 that the emergency room's excuse form was not sufficient for her to return to work, and that HR would send her documentation to complete. (PPFOF ¶ 133.) Carlson then obtained a note from her physician certifying that she could return to regular work on August 7, sent it to DéFort and Catlin with an explanation that she had received no documentation from HR, and said that she planned to work remotely on August 7 unless directed otherwise. (PPFOF ¶¶ 132–134.) When DéFort told her on the morning of August 8 to stop working, she responded that she had been cleared to return and asked whether she was to report to the office for the rest of the week. (PPFOF ¶ 136.) Hayes's

stated basis for removing her from work was expressly her "medical emergency," making it unclear why Carlson's doctor's note was insufficient to return her to work. (PPFOF ¶ 137.) HR did not send its fitness-for-duty letter to her provider until August 9, using an FMLA certification form despite knowing Carlson was attempting to return to work, and asked her provider whether she had a condition that would cause a change in her "mood or emotions." (PPFOF ¶¶ 138–140.) When Dr. Taylor again certified that Carlson could return to work, HR accepted it without further evaluation. (PPFOF ¶ 141.) Carlson was charged her own leave for the rest of that week. (PPFOF ¶ 142.)

Being removed from work and required to use accrued leave is plainly "some harm" to the terms and conditions of employment. Defendant's argument that there was no harm because leave was restored for the ten hours Carlson actually worked ignores the remaining days charged to her leave. And because Defendant's own documents state that the decision was based on Carlson's medical condition, a jury could find that it was made "solely by reason of" disability. Further, an employer's medical inquiries of a current employee must be "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 522–23 (7th Cir. 2015). Whether an inquiry into an ALJ's "mood or emotions," following a single transient episode after which her physician had cleared her to return, met that standard is, at minimum, a question for the jury.

### C. The fact-finding investigation, letter of expectation, and weekly monitoring altered the conditions of Carlson's employment.

When Carlson took FMLA leave for a flare-up of her conditions on September 30, 2022, she reported the absence before the workday and recorded it as FMLA leave in the State's system. (PPFOF ¶ 96.) Management had never before asked her the reason for her FMLA absences. (PPFOF ¶ 98.) When DéFort asked HR for guidance that morning, HR advised him to ask whether the absence was "an FMLA related absence for a flare-up, or a pre-scheduled medical appointment," and to "continue with further questions" only "[i]f

she states this is not FMLA." (PPFOF ¶ 97.) Carlson told DéFort on October 3 that the absence was FMLA-related. (PPFOF ¶ 100.) DéFort nonetheless demanded that she state the "specific reason" for her absence, told her she "must answer," and listed approved questions that included "what symptoms or medically necessary treatment" prevented her from working and whether she would see a doctor, while quoting a policy that a refusal may result in "discipline up to and including termination." (PPFOF ¶ 100.) Carlson provided the information, and DéFort acknowledged to HR that she had. (PPFOF ¶¶ 101, 102.) Defendant then subjected Carlson to an HR fact-finding meeting and issued a letter, retained in her personnel file, that accuses her of making a false statement about her supervisor (her complaint that the questioning felt like harassment for using FMLA) and warns that failure to meet its expectations may result in discipline up to and including termination. (PPFOF ¶¶ 101, 104, 105.)

Under *Muldrow*, a written accusation of dishonesty placed permanently in an employee's personnel file, coupled with an express warning of termination, is "some harm" to the terms and conditions of employment. The harm here was not hypothetical: Defendant refused Carlson's request to remove the letter, with HR citing Act 10 and Hayes describing her personnel file as a public record, and DéFort relied on it in her 2023 performance evaluation to criticize both her working relationship with him and her absence reporting. (PPFOF ¶¶ 106–108.)

The same is true of Defendant's requirement that Carlson, and only Carlson, attend weekly one-on-one meetings with the supervisor her psychologist had identified as the trigger for her anxiety. (PPFOF ¶¶ 87, 94.) DéFort announced the meetings by email on May 3, 2023, two days after Carlson's May 1, 2023 accommodation request, citing only her "year-to-date decision totals" and the need to "increase [her] productivity." (PPFOF ¶ 119.) Yet in 2023, seven of the fourteen Corrections ALJs fell short of Hayes's 220-decision goal, and three completed fewer total decisions than Carlson; none was required to attend weekly meetings. (PPFOF ¶¶ 16, 17, 94.) Defendant

now says the meetings are meant to reduce Carlson's isolation (DPFOF ¶¶ 204, 207), but DéFort's email announcing them says nothing about isolation, and in 2024 Defendant told the ERD that the meetings were started "[i]n order to correct" a productivity "deficiency." (PPFOF ¶¶ 119, 120.) The "deficiency" Defendant identified was Carlson's 2022 decision total, from the year she was returned to the office and began taking intermittent FMLA leave. (PPFOF ¶¶ 13, 95, 120.) Defendant also says the meetings are held because Carlson "is the only ALJ who works 100% remote" (DPFOF ¶ 271), but when the meetings began in May 2023 Carlson was working in the office half of the time; she did not begin working from home full time until 2024. (PPFOF ¶¶ 13, 24, 119.) Carlson has regular contact throughout the workday with the parties and agents in her hearings and with her colleagues and support staff, and she does not feel isolated. (PPFOF ¶ 25.) Defendant also characterizes the meetings as supportive (DPFOF ¶¶ 206–209), but whether they were supportive or a form of heightened scrutiny imposed on the only ALJ who had requested accommodations is a question of fact.

### D. A jury could find that Carlson's pay is not explained by seniority.

Defendant argues that Carlson's comparators are paid more because each has more years of state service, and that "[y]ears of state service is the basis for the available tools HR uses to determine their salary." (DPFOF ¶ 358.) Defendant's own records contradict that explanation. Starting pay in the broadbanded Attorney classification is set based on experience, education, budget, market data, and "any other relevant factor," not years of service. (PPFOF ¶ 147.) Ballenger had two more years of state service than Carlson, but was paid exactly the same rate throughout her employment in the CHU. (PPFOF ¶ 148.) DOA's 2026 equity analysis shows that Attorneys hired in 2014, 2021, and 2022 were paid exactly what Carlson was paid, and that an Attorney hired in 2016 was paid more. (PPFOF ¶ 149.) And in 2025, Cunningham and Hanson each received two equity adjustments that Carlson did not, and the gap between their pay and Carlson's has grown from $0.33 per hour in 2024 to $1.66 per hour today; Defendant has produced no

analysis explaining the 2025 adjustments. (PPFOF ¶¶ 150–152.) The "similarly situated" inquiry is a flexible, common-sense one, *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012), and when an employer's explanation is contradicted by its own records, a factfinder may infer that the explanation is not the real reason. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000).

### E. Defendant's conduct, taken together, could support a hostile work environment.

Defendant addresses Carlson's harassment allegations only by arguing that DéFort was entitled to ask about her absences. (Dkt. 29 at 45–46.) Whether a work environment is hostile depends on all of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Here, the circumstances include DéFort crouching to look through Carlson's office window to confirm she was there, a check he performed on no one else; repeatedly calling her, and calling her parents' home, on a day she had off for a medical appointment; denying her request to work two hours from home rather than take a full sick day ten days after she filed her charge; questioning her FMLA absences in a manner no other absence had ever prompted; subjecting her to an investigation and a termination warning; and removing her from work after a medical episode. (PPFOF ¶¶ 78–82, 96–105, 134–142.) Carlson's physicians documented the effect of this conduct on her anxiety and depression, and she was placed on medical leave in November 2021 because of it. (PPFOF ¶¶ 83, 86, 87.) This conduct was also "based on" Carlson's disability, which is the second element of the standard Defendant itself cites. (Dkt. 29 at 45 (citing *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016)).) Most of it concerned her medical absences, her medical appointments, her medical leave, or her requests for accommodation, and much of it followed her charge of discrimination, which also brings it within that standard's alternative of harassment "in retaliation for protected behavior." Viewed as a whole and in the light most favorable to Carlson, this record presents a jury question.

## IV. Carlson's Retaliation Claim Should Proceed to Trial.

### A. The Rehabilitation Act authorizes employment retaliation claims.

Defendant asks this Court to depart from consistent Seventh Circuit practice and hold, based on a Sixth Circuit decision, that the Rehabilitation Act does not permit retaliation claims. (Dkt. 29 at 48–51.) Defendant acknowledges that the Seventh Circuit has repeatedly adjudicated Rehabilitation Act retaliation claims, including twice this year. (*Id.* at 49–50 (citing *Shirk v. Trs. of Ind. Univ.*, 167 F.4th 460, 466–67 (7th Cir. 2026), and *Lewis v. Ind. Dep't of Transp.*, 173 F.4th 876 (7th Cir. 2026)).) The Court should decline Defendant's invitation to contradict controlling precedent.

Section 504(d) provides that the standards used to determine whether Section 504 has been violated "in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment." 29 U.S.C. § 794(d). Section 503 of the ADA, codified at 42 U.S.C. § 12203, is the ADA's anti-retaliation provision. It prohibits discrimination against any individual because she "has opposed any act or practice made unlawful by this chapter or because such individual made a charge" under the statute, and makes it unlawful to "coerce, intimidate, threaten, or interfere with" any individual in the exercise of rights under the statute. 42 U.S.C. § 12203(a)–(b). Congress therefore expressly incorporated the ADA's anti-retaliation provision into Section 504 for employment claims like Carlson's. Defendant's argument that Section 504 "contains no express anti-retaliation provision" does not engage with this incorporation at all. The Seventh Circuit's analysis of retaliation claims under Section 504(d), which Defendant itself quotes follows directly from that text.

### B. Carlson engaged in protected activity and suffered materially adverse actions.

Retaliation requires (1) statutorily protected activity, (2) a materially adverse action, and (3) a causal connection. *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023). Requesting an accommodation is protected activity. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015). Carlson requested accommodations in May 2021, December 2021, and April and May 2023; filed a charge of discrimination on September 28, 2021; complained in October 2022 that management's questioning of her FMLA absences was harassment and that DéFort was targeting her; filed a grievance in August 2023 complaining of retaliation since her EEOC charge; and complained to DOA's Deputy Administrator and Secretary about her treatment. (PPFOF ¶¶ 36, 74, 84, 101, 103, 116, 143, 144.)

Defendant's only argument on the second element is to incorporate its discrimination argument. (Dkt. 29 at 47.) But the retaliation standard is different than the discrimination standard on this element—an action is materially adverse if it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. Even if removing an employee from work after a medical episode and charging her leave; subjecting her to an HR investigation; placing a letter in her personnel file accusing her of making a false statement about her supervisor and warning of termination; and singling her out for weekly monitoring by that supervisor were not adverse actions under *Muldrow*, each would dissuade a reasonable worker from complaining. (PPFOF ¶¶ 94, 100–105, 134–142.) Defendant's own cited standard confirms the point. (Dkt. 29 at 28–29.)

### C. A jury could find a causal connection.

Defendant acknowledges that Seventh Circuit case law describes the causation element of a retaliation claim in two ways. Some decisions state that a plaintiff may prevail by showing that "retaliatory intent played a part" in the adverse action, while

others describe the standard as but-for causation. (Dkt. 29 at 47 (quoting *Lewis*, 2026 WL 1090714, at *5, and *Fuller*, 84 F.4th at 691, and citing *Brooks v. Avancez*, 39 F.4th 424, 440 (7th Cir. 2022)).) This Court need not resolve that question, because the evidence satisfies either standard.

A plaintiff may prove but-for causation with circumstantial evidence, including suspicious timing, ambiguous statements, and evidence that the employer's stated reasons are pretextual. *Coleman*, 667 F.3d at 860. The evidence here goes well beyond timing. Ten days after Carlson filed her charge, DéFort refused to let her work two hours from home and required her to take a full day of leave; within weeks, he was crouching to look through her office window and calling her parents' home. (PPFOF ¶¶ 74, 78–80, 82.) On the very day Carlson complained that DéFort's questioning of her FMLA absences felt like harassment, DéFort asked Hayes whether he should tell her that he "was mistaken and that she must attend in the fluorescent lighted room for the training," despite acknowledging that her accommodation included an office where the fluorescent lights could be kept off. (PPFOF ¶ 99.) DéFort had continued to press Carlson about the absence after she confirmed it was FMLA-related, although HR's advice had been to continue questioning only if it was not. (PPFOF ¶¶ 97, 100.) Following her complaint, Defendant responded with a fact-finding investigation and a letter that labels her complaint a "false and inaccurate statement about your supervisor," even though DéFort had already acknowledged that she provided the information he requested. (PPFOF ¶¶ 101–105.) DéFort announced the weekly meetings two days after Carlson's May 2023 accommodation request. (PPFOF ¶ 119.)

Further, Defendant's explanations for denying Carlson's requests have shifted. In 2021, management rejected Carlson's proposal to work in the office only on Fridays because she had not obtained a medical accommodation requiring it, but Defendant later told the EEOC that the proposal was denied because her provider had "restricted" her from working outside her home. (PPFOF ¶¶ 54, 55.) The 2021 denial letter cited

"exceptional personal reasons," although DéFort understood the reason to be the lack of a medical "restriction"; Defendant now says the process broke down. (PPFOF ¶¶ 71, 72; Dkt. 29 at 23.) The 2023 denial cited the lack of a "work restriction," a conclusion HR had drafted in April, two months before it sent any accommodation questionnaire to Carlson's providers. (PPFOF ¶¶ 115, 121, 126.) And DéFort has said that Cochrane's non-disability request was approved because it was supported by a "medical restriction." (PPFOF ¶¶ 27, 28.) From these shifting explanations a jury could infer that the stated reasons were not the real ones. DéFort's own evaluations point the same way. His 2023 review, covering the months in which he imposed weekly meetings to correct a supposed productivity "deficiency," remarked that she was less productive than most of her colleagues, but still rated her "Successful" on issuing decisions and called her "a good judge." (PPFOF ¶¶ 109, 110, 119, 120.) And after Defendant finally allowed her to work from home full time, his 2024 review rated her "Exceptional" as a Corrections ALJ and reported that she had issued more decisions than thirteen of the fifteen Corrections ALJs in the division, undercutting both the productivity rationale for the meetings and Defendant's position that she could not do her job from home. (PPFOF ¶¶ 24, 111.) Taken together, this evidence would permit a reasonable jury to find that Carlson's protected activity played a part in Defendant's actions, and that Defendant would not have taken those actions had she not engaged in it. *See Coleman*, 667 F.3d at 860–61.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment must be denied, as Plaintiff is entitled to have her claims decided by a jury of her peers. With respect to each claim, the evidence against Defendant creates legitimate issues for trial.

Dated: November 25, 2026.

*Electronically signed by Nicholas O. Yurk*

Nicholas O. Yurk, SBN: 1095278
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
NYurk@Employee-Advocates.com