UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

MARTHA CARLSON,

Plaintiff,

v. Case No. 26-cv-19-jdp

WISCONSIN DEPARTMENT OF ADMINISTRATION,
DIVISION OF HEARINGS AND APPEALS,

Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT**

---

Plaintiff, Martha Carlson, through her attorneys, Alan C. Olson & Associates, S.C., by Nicholas O. Yurk, responds to Defendant's Proposed Findings of Fact (Dkt. 30) as follows. Each of Defendant's proposed facts is restated below, followed by Plaintiff's response. Citations to "PPFOF" refer to Plaintiff's Proposed Findings of Fact, filed herewith.

## Background

1. Plaintiff Martha Carlson is an Administrative Law Judge (ALJ) employed by the Wisconsin Department of Administration (DOA), Division of Hearings and Appeals. She has been employed in this capacity since April 2013. (Dkt. 13:3.)

**RESPONSE:** Undisputed.

2. Brian Hayes is employed by DOA as the Administrator of DHA. He has held this position since October 20, 2013. (Hayes Decl. ¶ 2.)

**RESPONSE:** Undisputed.

3. As DHA Administrator, under the general supervision of the Secretary of the Department of Administration, Hayes is responsible for planning, directing, controlling, and evaluating the administration of DHA's programs and functions. These include, but are not limited to, coordination and evaluation of overall Division operations, plans, budgets, IT investments, policies, and objectives. (Hayes Decl. ¶ 3.)

**RESPONSE:** Undisputed.

4. As the Administrator, Hayes is responsible for the overall supervision of DHA employees, which includes ALJs. (Hayes Decl. ¶ 4.)

**RESPONSE:** Undisputed.

5. Eric DéFort is employed by DHA as an Assistant Division Administrator/ ALJ. He has been employed in this capacity since February 2018. (DéFort Decl. ¶ 2.)

**RESPONSE:** Undisputed.

6. DéFort was employed as an ALJ from March 2015 to February 2018. (DéFort Decl. ¶ 3.)

**RESPONSE:** Undisputed.

7. In his capacity as an Assistant Division Administrator, DéFort's duties include supervising ALJs, reviewing timesheets and completing payroll, overseeing the issuance of decisions, serving as the appellate tribunal when decisions are challenged on administrative appeal, drafting the corresponding administrative appeal decisions for the Administrator's review and approval, serving as the tribunal on re-hearing requests, drafting the corresponding re-hearing decisions for the Administrator's review and approval, responding to all post-hearing correspondence on Milwaukee Corrections unit cases, assisting in the preparation of pleadings where the DHA's cases are challenged in the state courts, and occasionally presiding over contested case hearings. (DéFort Decl. ¶ 4.)

**RESPONSE:** Undisputed.

8. Jessica Catlin is currently employed by DOA as an Equity & Inclusion Specialist - Senior. She has held this position since February 9, 2025. Previously, Catlin held the position of Medical & Reasonable Accommodation Coordinator for DOA from June 23, 2019 to February 8, 2025. (Catlin Decl. ¶ 2.)

**RESPONSE:** Undisputed.

9. As a Medical & Reasonable Accommodation Coordinator, Catlin was responsible for the oversight and coordination of the medical issues program for the Wisconsin Department of Transportation, Divisions of State Patrol and Business Management, the Public Service Commission, and the Department's Division of Hearings of Appeal.

**RESPONSE:** Undisputed.

10. Catlin provided supervisors, managers, and employees with professional guidance and assistance related to the Family and Medical Leave Act, medical leaves of absence, and fitness for duty determinations. (Catlin Decl. ¶ 3.) DHA

**RESPONSE:** Undisputed.

**DHA**

11. DHA is a quasi-judicial, independent entity created to conduct high quality, impartial, independent, and cost and time efficient hearings that serve customer agencies and the citizens of Wisconsin. (DéFort Decl. ¶ 5.)

**RESPONSE:** Undisputed.

12. The State of Wisconsin uses the central panel model for administrative hearings, where DHA's administrative law judges adjudicate disputes between members of the public and some of Wisconsin's state agencies. DHA is an independent and neutral arbiter in its adjudicative work. (DéFort Decl. ¶ 6.)

**RESPONSE:** Undisputed.

13. DHA currently conducts adjudicative hearing services for fifteen state agencies, such as the Departments of Corrections, Health Services, and Children and Families, and is also available to do hearings for other agencies when requested. (DéFort Decl. ¶ 7.)

**RESPONSE:** Undisputed.

14. DHA is divided into four jurisdictional areas: Corrections, General Government, Public Assistance and Social Service (PASS), and Workers Compensation. The Workers Compensation ALJs and functions were moved to the Department of Workforce Development on January 1, 2026. (Hayes Decl. ¶ 4.)

**RESPONSE:** Undisputed.

15. Currently, DHA employs 35 ALJs, 16 of which work solely on Corrections hearings. (Hayes Decl. ¶ 4.)

**RESPONSE:** Undisputed.

16. DéFort has been Carlson's direct supervisor since February 2018. (DéFort Decl. ¶ 8.)

**RESPONSE:** Undisputed.

17. Carlson is an ALJ in DHA's Corrections Unit in the Milwaukee Office. In that job, Carlson is expected to conduct formal administrative hearings, issue decisions, and ensure due process in correctional matters. (DéFort Decl. ¶ 9.)

**RESPONSE:** Undisputed.

18. The Corrections Unit at DHA handles adult probation, parole, extended supervision, and juvenile aftercare supervision cases. Requests for hearings in these cases are sent to the DHA by the Department of Corrections. (DéFort Decl. ¶ 10.)

> **RESPONSE:** Undisputed.

19. In 2019, DéFort became concerned when Carlson's productivity decreased and she issued fewer decisions than her ALJ colleagues in the Milwaukee Office. (DéFort Decl. ¶ 11.)

> **RESPONSE:** Undisputed that DéFort so declares. Carlson worked from the office throughout 2019, and she issued more decisions in 2020, when she worked entirely from home, than she did in 2019. DéFort's own August 2021 evaluation described Carlson as "one of the more productive Corrections unit judges across the entire division." (PPFOF ¶¶ 11, 12, 15.)

20. Carlson issued 258 written decisions in 2018 and only 154 decisions in 2019. (DéFort Decl. ¶ 11.)

> **RESPONSE:** Undisputed.

**<u>Working from Home and Absence Policies Prior to the Covid-19 Pandemic</u>**

21. Before COVID-19, ALJs traveled to county jails or state correctional institutions to conduct in-person hearings where the accused individuals were detained. (DéFort Decl. ¶ 12.)

> **RESPONSE:** Undisputed.

22. ALJs also worked in an office building when they did not have hearings so they could write, edit, and issue decisions while collaborating with each other and support staff. (DéFort Decl. ¶ 12.)

> **RESPONSE:** Undisputed.

23. Before COVID-19, DHA allowed ALJs to work from home on a temporary and limited basis if first approved by a supervisor. ALJs also were required to send DéFort a brief email with the details of any absences before taking leave or working from home. This included if an ALJ left work early after a hearing. (DéFort Decl. ¶ 13; Carlson Dep. 132:2-6.)

> **RESPONSE:** Undisputed that, before the pandemic, ALJs were expected to email DéFort before taking leave and that DHA intermittently allowed ALJs to work from home with supervisor approval. Disputed to the extent this paragraph asserts that ALJs were required to state the reason for an absence; Carlson does not agree that a reason was required, and her practice was to report the date of her absence and that any hearings on her calendar needed to be rescheduled or reassigned. (Carlson Dep. 13:16–23, 131:15–132:10.)

24. On November 6, 2019, DéFort emailed Carlson because she did not report absences on October 29, 2019, and October 30, 2019. It is DéFort's understanding that Carlson's hearings were cancelled, and she forgot to enter leave time. (DéFort Decl. ¶ 14 Ex. 1030, at 1.)

**RESPONSE:** Undisputed.

25. DéFort forwarded Carlson the email he sent to all ALJs on May 7, 2018, regarding the correct procedure for reporting absences. (DéFort Decl. ¶ 15 Ex. 1030, at 1.)

**RESPONSE:** Undisputed.

26. On January 28, 2020, DéFort emailed Carlson because she left work after adjourning a 9AM hearing the day before without giving DéFort notice of her absence. (DéFort Decl. ¶ 16 Ex. 1031, at 4.)

**RESPONSE:** Undisputed.

27. Carlson's January 27, 2020, hearing was held at the Milwaukee County Jail, which is two blocks away from the DHA Milwaukee office headquarters, and so DéFort expected Carlson to return to the office after the hearing. Carlson reported the details of her absence in response to DéFort's email. (DéFort Decl. ¶ 16 Ex. 1031, at 1-2.)

**RESPONSE:** Undisputed.

28. On February 11, 2020, DéFort sent a reminder email regarding absences, stating, "If you plan on being absent from the Milwaukee office (for reasons other than conducting hearings), please send me a brief email with the details of your absence… within a reasonable time before the absence. If you need to take sick- time/medical leave, please email me before the absence. If it's an emergency that prevents you from emailing, then call me." (DéFort Decl. ¶ 18 Ex. 1032, at 1.)

**RESPONSE:** Undisputed.

## <u>Working from Home After the Covid-19 Pandemic</u>

29. Because of the COVID-19 pandemic, ALJs conducted hearings virtually and worked entirely remotely starting on or about March 17, 2020, until July 6, 2021. (DéFort Decl. ¶ 19.)

**RESPONSE:** Undisputed.

30. During the COVID-19 pandemic, the DHA Administrator was obligated to report (to the DOA Secretary) which employees were working from home, in the state office building, or were on leave. (DéFort Decl. ¶ 21.)

**RESPONSE:** Undisputed.

31. The DHA Administrator required ALJ supervisors to submit daily reports on employee location. To ensure an accurate report, DéFort instructed the ALJs to send daily emails with this information so DéFort could submit it to the Administrator. (DéFort Decl. ¶ 21.)

**RESPONSE:** Undisputed.

32. Because DéFort is responsible for reviewing timesheets and approving payroll for the multiple ALJs that he supervises, DéFort cannot remember and assess leave requests without a system of organization. It is essential that employees email leave requests to DéFort. (DéFort Decl. ¶ 22.)

**RESPONSE:** Undisputed that DéFort so declares.

33. DéFort had to remind Carlson of the absence policy more than once when she did not report absences. (DéFort Decl. ¶ 23 Ex. 1033, at 1 Ex. 1034, at 1.)

**RESPONSE:** Undisputed that DéFort sent Carlson reminders regarding the absence-reporting policy. (DéFort Decl. Exs. 1033, 1034.)

34. During COVID-19, DéFort also met with all ALJs virtually on a weekly basis to check in with them as a team and stay informed of issues that may affect the unit's work. (DéFort Decl. ¶ 24.)

**RESPONSE:** Undisputed.

35. DHA receives a high volume of physical mail. Many state agencies conduct hearings for pro se individuals who do not electronically file documents and therefore rely on physical documents. (Hayes Decl. ¶ 5.)

**RESPONSE:** Undisputed that Hayes so declares.

36. During the emergency shutdown period of the pandemic, DHA support staff were physically in the office to process mail, receive service of process documents and collaboratively process and schedule hearing requests. (Hayes Decl. ¶ 5.)

**RESPONSE:** Undisputed that Hayes so declares.

37. ALJs worked from home during the pandemic. When support staff were in the office, they had to send documents to the ALJs working at home or even drive to an ALJ's home to hand-deliver documents. (Hayes Decl. ¶¶ 5, 6.)

**RESPONSE:** Undisputed that Hayes so declares.

38. This was inefficient and an unequal division of labor. It was not productive or fair to have ALJs working 100% remote while over 20 individual support staff worked in-office. (Hayes Decl. ¶ 6.)

**RESPONSE:** Undisputed that Hayes so declares. Disputed to the extent this paragraph implies that in-office attendance is an essential function of Carlson's position. Carlson's position description does not list in-office work as a duty,

Corrections hearings are conducted by video, and DHA has permitted Carlson to work from home full time since February 2024, during which DéFort rated her "Exceptional" as a Corrections ALJ. (PPFOF ¶¶ 1–4, 14, 18, 111.)

39. Additionally, some ALJs had to work in office because their hearings were in person thus creating an inequity between ALJs. (Hayes Decl. ¶ 6.)

**RESPONSE:** Undisputed that ALJs in some units conducted in-person hearings. Corrections hearings, including Carlson's, are conducted by video, and DHA's Return to Office Plan does not require Corrections hearings to be conducted from a state office building. (PPFOF ¶¶ 4, 9.)

40. Being an ALJ is a lonely job, with much time spent writing and conducting hearings. Hayes had concerns about ALJs being isolated and overwhelmed at home due to a lack of interaction with each other. (Hayes Decl. ¶ 7.)

**RESPONSE:** Undisputed that Hayes so declares. Disputed as applied to Carlson, who has worked from home full time since February 2024, has regular contact with the parties and agents in her video hearings and with her colleagues and support staff by telephone, Teams chat, email, and video conference, and does not feel lonely or isolated. (PPFOF ¶¶ 24, 25.)

41. Because of the difficult nature of their cases, ALJs can experience secondary trauma. As a former ten-year Corrections ALJ, Hayes believes that in- person collaboration can lessen the negative impact of exposure to handling traumatic cases. (Hayes Decl. ¶ 7; DéFort Decl. ¶ 28.)

**RESPONSE:** Undisputed that Hayes so declares.

42. As the pandemic ebbed, around February 2021, Hayes convened a team of five individuals from DHA: Sally Peterson, Senior ALJ, Carla Whitley, Administrative Manager for DHA, Bronwyn Baldwin, Workers Compensation ALJ, Deb Bursinger, Milwaukee PASS ALJ and Teresa Perez, PASS ALJ, to discuss and develop a telework policy for all DHA staff. (Hayes Decl. ¶ 8.)

**RESPONSE:** Undisputed that Hayes so declares.

43. Together, the team decided that a 50% telework policy met DHA's work environment needs. The intent was to balance in-office and telework between the different jurisdictions and between the work requirements of ALJs and support staff. (Hayes Decl. ¶ 9.)

**RESPONSE:** Undisputed that Hayes so declares.

44. The 50% telework policy reduced the burden placed on support staff, allowed for in-office collaboration between ALJs, between support staff and between support staff and ALJs. It allowed for staff interaction while also providing the convenience of working from home. It treated everyone the same. (Hayes Decl. ¶ 10.)

**RESPONSE:** Undisputed that Hayes so declares. Disputed that the policy "treated everyone the same." The Return to Office Plan itself provides that "DHA employees will not have the same plan," and DHA permitted ALJ Kelly Cochrane

to work from home full time because of her husband's health. (DéFort Decl. Ex. 1036, at 9; PPFOF ¶¶ 26, 27.)

45. Around May 18, 2021, the DHA advised the ALJs that they would return to work in the office on a 50% basis and continue to work remotely on a 50% basis. (DéFort Decl. ¶ 25.)

**RESPONSE:** Undisputed.

46. In his May 18, 2021, "Return to Office Plan," Hayes advised the ALJs that they should work a 50% hybrid / alternate work pattern (AWP) bi-weekly schedule. (DéFort Decl. ¶ 26 Ex. 1035, at 1-2.)

**RESPONSE:** Undisputed.

47. Although DéFort was not part of the working group that Hayes convened to formulate the 50% telework policy, DéFort agreed with the policy that Hayes issued. (DéFort Decl. ¶ 27.)

**RESPONSE:** Undisputed.

48. DHA implemented the 50% telework policy on July 6, 2021, and the policy has lessened the burden on support staff and allowed DHA to maintain collaboration between support staff and the ALJs to create a better work environment. (Hayes Decl. ¶ 11; DéFort Decl. ¶ 29.)

**RESPONSE:** Undisputed that Hayes and DéFort so declares.

49. DéFort believes that Carlson did not support this 50% telework policy because in June 2020, she advocated for 100% remote work for ALJs largely on the basis of reducing commute time. (Hayes Decl. ¶ 12; DéFort Decl. ¶ 31 Ex. 1037, at 1.)

**RESPONSE:** Undisputed that DéFort so believes and that Carlson sent the June 2020 email. Disputed that Carlson's position was based "largely" on commute time; the June 2020 email was a general proposal for all ALJs who wished to work remotely, and it also identified the fluorescent lighting that triggers Carlson's migraines. (DéFort Decl. Ex. 1037, at 1–2; Carlson Dep. 79:17–82:23.)

50. In her June 2020 email advocating for all ALJs to continue to work remotely, Carlson wrote: I understand that there may be legitimate concerns about employees remaining productive while working from home. Everyone's situation is certainly different and I can only speak for myself. I have found, however, that I have been more productive while working from home since March. I am able to accomplish more tasks during the work day as I do not have a 2 hour commute and can spend those 2 hours working rather than commuting. Also, I do not have to come to the office or to hearings stressed due to traffic congestion, road construction, or road rage. In the evenings, rather than looking at the clock wondering when the best time to leave the office would be to avoid downtown rush hour, I often times work on decisions, schedule cases, or send e-mails out well until 6 pm. I can tell you all that I have been much more focused on my work as I am not thinking about traffic, walking several blocks to get to my car, and the accompanying stress. There is also the obvious savings to DHA by not reimbursing ALJs for mileage / travel costs. It is also possible that the need for extended office space would be eliminated. (DéFort Decl. Ex. 1037 at 1.)

**RESPONSE:** Undisputed.

51. Carlson continued by acknowledging the "desire of Hearings and Appeals to make sure that a community of ALJs are available to discuss concerns with or bounce ideas off of." (DéFort Decl. Ex. 1037 at 1.)

**RESPONSE:** Undisputed.

52. Carlson said that she believed that the stress of the commute applied to everyone, not just herself. (Carlson Dep. 81:15-17.)

**RESPONSE:** Undisputed that Carlson testified that the stress of commuting applies generally. Carlson also testified that her email raised conditions specific to herself, including her migraines. (Carlson Dep. 81:12–25.)

53. Carlson also wrote that the "glaring fluorescent lights" in the hearing rooms and at the institutions, such as Milwaukee Secure Detention Facility and Kenosha County Detention Center, caused migraine headaches. She claimed to have not suffered from a single migraine at home. (DéFort Decl. Ex. 1037, at 2.)

**RESPONSE:** Undisputed.

54. Carlson recalls mentioning her issues about the fluorescent lights in the hearing rooms to her former supervisor and believed there were some changes to the lights to those rooms. (Carlson Dep. 83:10-15.)

**RESPONSE:** Undisputed that Carlson so testified. The changes Carlson recalled involved some lights in the video rooms at the State Office Building; the remainder of the building's common areas, hallways, support staff area, and bathrooms are lit by fluorescent lights. (Carlson Dep. 83:10–15, 70:23–71:13.)

**Carlson's Request for Remote Work: Migraines and Back Pain**

55. After employees were notified that they would be returning to work on a hybrid schedule, Carlson made a request for 100% remote work in an email to Hayes on May 5, 2021, and copied DéFort and Catlin. (DéFort Decl. ¶ 32 Ex. 1029, at 1-2.)

**RESPONSE:** Undisputed.

56. In that email, Carlson suggested that if she were allowed to work 100% from home she "would be happy" to show that she is "remaining productive from home" by having "daily/weekly check-ins, providing a daily log of [her] activities, or giving up any in-office days that would be placed on [her] calendar to keep caseload up." (DéFort Decl. ¶ 32 Ex. 1029, at 1-2.)

**RESPONSE:** Undisputed.

57. In her email to Hayes and DéFort, Carlson wrote that she was promised that she would be allowed to work from home by a previous administrator when she was hired in 2013. (DéFort Decl. Ex. 1029, at 1.)

**RESPONSE:** Undisputed.

58. Additionally, Carlson wrote that her home office set-up had greatly reduced her migraines, back problems, and eye strain, and greatly improved her physical and mental health. (DéFort Decl. Ex. 1029, at 1.)

**RESPONSE:** Undisputed.

59. Carlson had suffered migraines and back problems before making any work from home request. (Carlson Dep. 127:6-14.)

**RESPONSE:** Undisputed.

60. On May 6, 2021, Carlson emailed Catlin asking if she was the appropriate contact to assist Carlson in obtaining a work from home arrangement due to medical conditions. (Catlin Decl. ¶ 4 Ex. 1000, at 6.)

**RESPONSE:** Undisputed.

61. On May 7, 2021, Catlin responded by confirming she was the appropriate contact as the Medical and Reasonable Accommodation Coordinator for DHA. Catlin asked Carlson if she was applying for Family Medical Leave (FMLA) because she referenced medical conditions in her email to Hayes. (Catlin Decl. ¶ 5 Ex. 1000, at 5.)

**RESPONSE:** Undisputed.

62. Carlson responded that she was not requesting medical leave, but instead requested to continue to work 100% remote. All ALJs were scheduled to return to the office on July 6, 2021, but Carlson was concerned about contracting the Covid-19 virus and believed that remote work improved her chronic health conditions. (Catlin Decl. ¶ 6 Ex. 1000, at 4-5.)

**RESPONSE:** Undisputed. Carlson also told Catlin that fluorescent lights trigger her migraines and that she had chronic back problems. (PPFOF ¶ 38.)

63. On May 7, 2021, Carlson messaged her provider requesting assistance with working from home once employees were set to return to the office on July 6. (Carlson Dep. 68:6-18.)

**RESPONSE:** Undisputed.

64. In January and February 2021, while Carlson was working remotely, she told Dr. Taylor that she was experiencing migraines, depression, suicidal ideation, and feeling work-related stressed and overworked. (Carlson Dep. 60-63:19- 6; 64:13-18; Polich Decl. Ex. 1069, at 7-8.)

**RESPONSE:** Undisputed that the medical records contain the quoted entries. Carlson objects that this paragraph is immaterial to any issue raised by Defendant's motion and unnecessarily places sensitive mental-health information in the public record.

65. However, in May 2021, Carlson told Dr. Taylor: After working from home exclusively for the past year, I realized that the work environment that I set up at home eased my chronic health conditions, including depression/anxiety, chronic migraines, and back strain. Prior to the Covid-19 pandemic, my job duties largely consisted of going into jails or prisons to conduct hearings for prisoners. The small rooms that the hearings occurred in were lit with fluorescent lights and the chairs were very uncomfortable. The tables were very small and I could not lift up my laptop or set up a foot stool for my feet. Fluorescent lights are triggers for my migraines and I also have chronic back problems which were exacerbated by the chairs. Some hearings were held by video at the State Office Building in Milwaukee, but I had the same issues with the fluorescent lights and the chairs, although better, were still not the best. Again, the tables were small and I could not adjust my laptop, nor set up a foot stool. Since working from home, I have set up my home office using only natural light (no fluorescent lights), an ergonomic chair, a foot rest, and a laptop stand. Because of this, the instances of my migraines and back pain has decreased. My employer has been conducting all our hearings by video and my set-up at home is more conducive to my health than going to the State Office Building to do video hearings. Working from home also lessens my anxiety/depression in commuting into downtown Milwaukee. I am also fearful of returning to the office in the event that I contract COVID-19 because of my kidney disease and the fact that not everyone wears masks. For these reasons, I asked my supervisor if I could be allowed to continue working from home. My employer denied my request and I am wondering if Dr. Taylor could write a letter confirming that my request is appropriate or whether there is anything else Dr. Taylor could suggest that may help. (Polich Decl. Ex. 1069, at 6.)

**RESPONSE:** Undisputed.

66. In May 2021, Carlson's estimated commute to the Milwaukee Office building was an hour and 15 minutes (30 to 35 miles one way). (Carlson Dep. 72:4-9.)

**RESPONSE:** Undisputed.

67. Carlson stated that commuting to Milwaukee was stressful because "people don't drive very well," traffic jams, accidents, road construction, finding parking, homeless people, and potentially running into probation and parole agents or people that she has sent to prison. (Carlson Dep. 72-73:11-14.)

**RESPONSE:** Undisputed.

68. On May 11, 2021, Catlin responded that Carlson would need to establish that she has a disability to qualify for remote work as a reasonable accommodation and explained the process. (Carlson Decl. ¶ 7 Ex. 1000, at 4.)

**RESPONSE:** Undisputed. (The supporting citation should be to the Catlin Declaration, not a "Carlson Decl.")

69. Pursuant to Region 1 HR Policy #402 – Reasonable Accommodations in Employment, an employee's request for reasonable accommodation is interactive process between management, human resources (HR), and the employee. (Catlin Decl. ¶ 8 Ex. 1001, at 1.)

**RESPONSE:** Undisputed.

70. Catlin advised Carlson about the steps for the accommodation process. The employee initiates the process by submitting a Reasonable Accommodation Request form. The employee is then asked to submit medical documentation to support the request. (Catlin Decl. ¶ 8 Ex. 1001, at 1.)

**RESPONSE:** Undisputed.

71. Catlin, as the Medical & Reasonable Accommodation Coordinator, then works with management to understand the employee's job duties and discuss the requests. (Catlin Decl. ¶ 8 Ex. 1001, at 1-2.)

**RESPONSE:** Undisputed.

72. Finally, Catlin works with the employee and management to reach a final decision regarding the accommodation request. (Catlin Decl. ¶ 8 Ex. 1001, at 1- 2.)

**RESPONSE:** Undisputed.

73. Catlin advised Carlson: "Please be specific about what you are requesting. I will reach out to you once I have received the request form." (Catlin Decl. ¶ 10 Ex. 1000, at 4.)

**RESPONSE:** Undisputed.

74. During the interactive process, Carlson worked from home while other ALJs worked in the office 50% of the time. (DéFort Decl. ¶ 34.)

**RESPONSE:** Undisputed.

75. On June 3, 2021, Catlin emailed Carlson to check in on the status of Carlson's accommodation request. (Catlin Decl. ¶ 11 Ex. 1000, at 2-3.)

**RESPONSE:** Undisputed.

76. Carlson responded the next day that she had to wait for her doctor to complete the form. She then attached a copy of the accommodation request form completed by her medical provider, Dr. Taylor. (Catlin Decl. ¶ 11 Ex. 1000, at 2-3.)

**RESPONSE:** Undisputed.

77. Dr. Taylor listed migraines and chronic back pain as Carlson's chronic disabilities, and recommended a chair, stand/sit desk and other in-office accommodations. (Catlin Decl. ¶ 12 Ex. 1002, at 1.)

**RESPONSE:** Undisputed that the June 4, 2021 form completed by Dr. Taylor so states. Dr. Taylor's subsequent Medical Inquiry answered "Yes" to whether the restriction from working outside the home was permanent and applied to all work hours. (PPFOF ¶¶ 42, 43.)

78. Carlson, and not Dr. Taylor, should have filled out the accommodation request form. After the employee fills out the accommodation request form, the doctor completes a different form known as the medical inquiry. (Catlin Decl. ¶ 13.)

**RESPONSE:** Undisputed.

79. On June 4, 2021, Carlson and Catlin corrected this mistake and Carlson completed her accommodation request the same day. (Catlin Decl. ¶ 14 Ex. 1000, at 1 Ex. 1003, at 1.)

**RESPONSE:** Undisputed.

80. Carlson requested to work from home (100% telework) and listed triggers for her "medical conditions." (Catlin Decl. ¶ 15 Ex. 1003, at 1.)

**RESPONSE:** Undisputed.

81. On June 15, 2021, Catlin emailed a letter to Carlson to give to Dr. Taylor, which explained that Carlson requested a disability accommodation and that her employer needed specific detailed information. (Catlin Decl. ¶ 16 Ex. 1004, at 1.)

**RESPONSE:** Undisputed.

82. Catlin attached a medical questionnaire for Dr. Taylor to complete, along with a copy of Carlson's position description, which needed to be considered to complete the questionnaire. (Catlin Decl. ¶ 16 Ex. 1004, at 2-7.)

**RESPONSE:** Undisputed.

83. On June 21, 2021, Catlin received Dr. Taylor's completed medical questionnaire. (Catlin Decl. ¶ 17 Ex. 1005, at 1-7.)

**RESPONSE:** Undisputed.

84. When Catlin reviewed Dr. Taylor's questionnaire, Catlin determined that more information was required to approve or deny Carlson's disability accommodation request because the responses to the questionnaire were incomplete and inconsistent. (Catlin Decl. ¶ 18 Ex. 1005, at 4-5.)

**RESPONSE:** Undisputed that Catlin reached that conclusion. Disputed that Dr. Taylor's responses were incomplete as to whether Carlson was restricted from working outside the home; Dr. Taylor circled "Yes" in response to whether the restriction was permanent and whether it applied to all work hours, questions that apply only "[i]f Yes." (PPFOF ¶¶ 42–44.)

85. Specifically, the questionnaire asked if Carlson's impairment was permanent and Dr. Taylor checked "No." (Catlin Decl. ¶ 18 Ex. 1005, at 4-5.)

**RESPONSE:** Undisputed that Dr. Taylor checked "No" to whether Carlson's impairment is long-term or permanent. On the same form, Dr. Taylor circled "Yes" to whether Carlson's restriction from working outside the home is permanent. (PPFOF ¶¶ 42, 43.)

86. Additionally, Dr. Taylor did not circle yes or no, in response to the question: "is the employee medically restricted from working outside the home?" Instead, Dr. Taylor listed accommodations Carlson had at home that could be provided in-office for her migraines and back pain. (Catlin Decl. ¶ 18 Ex. 1005, at 4- 5.)

**RESPONSE:** Disputed. Although Dr. Taylor did not circle an answer on the first line of Question C.4, he circled "Yes" to subparts (a) and (b), which ask whether the restriction is permanent and applies to all work hours and which apply only "[i]f Yes." Dr. Taylor did not list accommodations that "could be provided in-office"; he recommended that Carlson avoid fluorescent lighting and strong scents and odors, and referenced her sit-to-stand setup at home. (PPFOF ¶¶ 41–43.)

87. On June 28, 2021, Catlin sent an email to Carlson stating that Dr. Taylor did not restrict her from working outside her home, provided Carlson can avoid fluorescent lighting, strong scents and odors, and had a sit-stand workstation. (Catlin Decl. ¶ 20 Ex. 1006, at 3-4.)

**RESPONSE:** Undisputed that Catlin sent the email. Disputed that Dr. Taylor did not restrict Carlson from working outside the home. (PPFOF ¶¶ 42–44.)

88. Carlson disagreed and stated she was medically restricted from working outside the home. She then made a counterproposal to work from home Monday through Thursday and in-office on Friday. (Catlin Decl. ¶ 21 Ex. 1006, at 2- 3.)

**RESPONSE:** Undisputed. In disagreeing, Carlson pointed Catlin to Dr. Taylor's "Yes" answers to Question C.4, and she proposed working in the office on Fridays, the one day of the week on which in-office attendance was mandatory and on which hearings are not normally scheduled. (PPFOF ¶¶ 8, 10, 44, 51.)

89. Carlson hoped to come to "a conciliatory agreement that would benefit [her] medical conditions and address whatever concerns management had at the time." (Carlson Dep. 100:3-15.)

**RESPONSE:** Undisputed.

90. Catlin explained that Carlson's counterproposal was contradictory with a medial restriction: "If you are asserting that your medical provider has 'restricted' you from working outside your home than you would not be able to come into the office at any time. Your counter-proposal would go against your physician's recommended work restrictions, if that is what your physician was inferring. This could be an undue hardship to your employer." (Catlin Decl. ¶ 22 Ex. 1006, at 1-2.)

**RESPONSE:** Undisputed that Catlin so wrote. Before Catlin sent this email, DéFort had already told her that he and Hayes were "declining her counter offer," and Catlin asked them to reconsider and allow a 30-day exception so she could obtain more medical documentation. (PPFOF ¶¶ 52, 54–56.)

91. Carlson did not believe that her counterproposal conflicted with her physician's recommended work restrictions. Carlson stated she suggested working in the office on Fridays to try to be conciliatory with management. (Carlson Dep. 103:17- 25.)

**RESPONSE:** Undisputed.

92. Catlin needed to determine whether Dr. Taylor had determined that Carlson was medically restricted from working outside the home all days of the week. (Catlin Decl. ¶ 23.)

**RESPONSE:** Undisputed that Catlin so declares. Management had already declined Carlson's counterproposal before Catlin sought further information. (PPFOF ¶¶ 54–56.)

93. On June 30, 2021, Catlin sent an email to Carlson requesting additional information from Dr. Taylor and attached a more detailed questionnaire for him to complete. (Catlin Decl. ¶ 24 Ex. 1007, at 1-3.)

**RESPONSE:** Undisputed.

94. Catlin regularly requested additional information from medical providers as part of the interactive process to ensure employees receive necessary accommodations in accordance with their medical needs. (Catlin Decl. ¶ 25.)

**RESPONSE:** Undisputed that Catlin so declares.

95. On July 8, 2021, Catlin received a response from Dr. Taylor (dated July 7, 2021). (Catlin Decl. ¶ 26 Ex. 1008, at 4-6.)

**RESPONSE:** Undisputed.

96. Again, Dr. Taylor provided contradictory information. Specifically, when asked if Carlson was medically restricted from working outside the home, he circled "yes" but also wrote "patient can work in-office on Fridays." (Catlin Decl. ¶ 27 Ex. 1008, at 5-6.)

**RESPONSE:** Undisputed that Dr. Taylor circled "Yes," wrote that the restriction would last "permanently," and wrote "patient can work in office on Fridays." Disputed that this information was contradictory. Dr. Taylor wrote that Carlson could work in the office on Fridays in direct response to Catlin's question about Carlson's agreement, "[a]s part of the interactive process," to work from the office one day per week, which Carlson had discussed with Dr. Taylor. When Catlin asked him to clarify, Dr. Taylor wrote that the Friday statement "was an error" and that he recommended Carlson not work in the office for the medical reasons previously stated. (PPFOF ¶¶ 57–61.)

97. On July 16, 2021, Catlin emailed a letter and third medical questionnaire to Carlson to give to Dr. Taylor, requesting clarification regarding whether Carlson could work in-office. (Catlin Decl. ¶ 29 Ex. 1009, at 2-4.)

**RESPONSE:** Undisputed.

98. Catlin asked: "In a previous medical questionnaire, you stated 'patient can work in office on Fridays.' Can you please clarify/confirm if Carlson is restricted to working in the office only on Fridays?" (Catlin Decl. ¶ 29 Ex. 1009, at 2-4.)

**RESPONSE:** Undisputed.

99. Catlin received responses to the third medical questionnaire on July 20, 2021. (Catlin Decl. ¶ 30 Ex. 1009, at 1.)

**RESPONSE:** Undisputed.

100. This time the medical questionnaire had two different forms of handwriting. (Catlin Decl. ¶ 32 Ex. 1010, at 1.)

**RESPONSE:** Undisputed that the July 19, 2021 questionnaire contains two forms of handwriting.

101. Catlin needed to determine who provided the information on the questionnaire. (Catlin Decl. ¶ 32.)

**RESPONSE:** Undisputed.

102. Catlin learned that Amber Turville from the Aurora Health Care disability department and Dr. Taylor both had completed portions of the questionnaire. (Catlin Decl. ¶ 33 Ex. 1010, at 1.)

**RESPONSE:** Undisputed that Amber Turville is employed in the Aurora Health Care disability department, not by DHA as stated in Catlin Decl. ¶ 33. (Catlin Decl. Ex. 1027, at 2.)

103. Turville had circled "yes" to the question of whether Carlson was permanently restricted from working outside the home, but Dr. Taylor only recommended that she not work outside the home. (Catlin Decl. ¶ 33 Ex. 1010, at 1.)

**RESPONSE:** Undisputed that Catlin's July 30, 2021 email so reports. Disputed to the extent this paragraph implies that Dr. Taylor himself never restricted Carlson from working outside the home; his July 7, 2021 response circled "Yes" and stated the restriction would last "permanently," and on the July 19, 2021 questionnaire he signed, Dr. Taylor wrote in his own hand that he recommended Carlson not work in the office. (PPFOF ¶¶ 59–61.)

104. A restriction is an absolute limit placed by a provider on an employee's work duties or daily routines due to the employee's health condition or injuries. For example, a provider may restrict an employee from lifting over 25 pounds or standing for prolonged periods of time. (Catlin Decl. ¶ 34.)

**RESPONSE:** Undisputed that Catlin so defines the term. The definition does not appear in Policy #402, which does not condition an accommodation on a "restriction." (PPFOF ¶ 32.)

105. On the other hand, a recommendation is different from a restriction because a medical recommendation is advice or approval from a healthcare provider suggesting a specific treatment or therapy that could benefit the employee's health. (Catlin Decl. ¶ 34.)

**RESPONSE:** Undisputed that Catlin so defines the term. The distinction does not appear in Policy #402. In 2023, DHA granted Carlson in-office accommodations based on her provider's recommendations. (PPFOF ¶ 32; DPFOF ¶¶ 222–225.)

106. Catlin explained to Carlson that for accommodation purposes, a recommendation is different from a medical restriction. (Catlin Decl. ¶ 35 Ex. 1010, at 1.)

**RESPONSE:** Undisputed.

107. Catlin could not recommend that Carlson's employer approve a 100% remote work accommodation because the medical documentation that Catlin received was conflicting. (Catlin Decl. ¶ 36 Ex. 1010, at 1.)

**RESPONSE:** Undisputed that Catlin so declares. Disputed that the medical documentation was conflicting: Dr. Taylor's forms consistently identified the same workplace triggers and, when asked, stated that the restriction from working outside the home was permanent. When Catlin asked about his statement that Carlson could work in the office on Fridays, Dr. Taylor answered that it was an error and that he recommended Carlson not work in the office. (PPFOF ¶¶ 41–43, 57–61.)

108. Catlin told Carlson that she tried to contact Dr. Taylor to clarify whether she medically restricted from working outside the home, and asked: "Would you be willing to give your clinic a call and ask them to contact me?" (Catlin Decl. ¶ 37 Ex. 1010, at 1.)

**RESPONSE:** Undisputed.

109. Catlin often asked employees for permission to contact their medical provider directly when documentation requires clarification. (Catlin Decl. ¶ 38.)

**RESPONSE:** Undisputed that Catlin so declares.

110. Dr. Taylor refused to return Catlin's phone calls and Carlson did not arrange a call for Catlin. (Catlin Decl. ¶ 39.)

**RESPONSE:** Disputed. Undisputed that Dr. Taylor did not return Catlin's calls. Carlson contacted her doctor's office and relayed Catlin's request to speak with Dr. Taylor, and informed Catlin that she had done so. Carlson has no control over whether Dr. Taylor returns calls. (PPFOF ¶¶ 64, 66.)

111. Carlson wrote to Dr. Talyor that she did not want Dr. Taylor to call Catlin back, as she did not want any communication occurring with Carlson present. (Carlson Dep. 106:2-8.)

**RESPONSE:** Disputed as stated. Carlson's message said she did not want any communication occurring "without me being present." Carlson objected only to an unrecorded telephone conversation and did not object to Catlin sending further written questionnaires. (Polich Decl. Ex. 1069, at 5; Carlson Dep. 106:2–20, 107:6–15; PPFOF ¶ 65.)

112. It is Catlin's understanding that Carlson did not want Catlin to speak Dr. Taylor, which is unusual. Typically, employees facilitate communication with their doctor to ensure complete medical documentation and approval of an accommodation request. (Catlin Decl. ¶ 40.)

**RESPONSE:** Undisputed that Catlin so declares. Disputed to the extent this paragraph implies that Carlson did not facilitate communication with her doctor. (PPFOF ¶¶ 64, 65.)

113. Catlin emailed Carlson on July 30, 2021, asking Carlson to contact her clinic because Catlin had not heard anything back from Carlson or her clinic, even after leaving two messages. (Carlson Dep. 109:12-17; Catlin Decl. Ex. 1010, at 1.)

**RESPONSE:** Undisputed. Carlson responded on August 6, 2021 that she had contacted her doctor's office and relayed Catlin's message. (PPFOF ¶ 64.)

114. Carlson did not want Catlin speaking with Dr. Taylor directly "with no record of what was being said." Carlson did not take issue with Catlin sending questionnaires to Dr. Taylor for Dr. Taylor to fill out and did not understand why another questionnaire with more specific questions could not be sent to Dr. Taylor again so that there would be a record of her questions and his answers. (Carlson Dep. 107:6-15; Polich Decl. Ex. 1069, at 5.)

**RESPONSE:** Undisputed.

115. Carlson wrote a message to Dr. Taylor asking to re-do the questionnaire since there was conflicting information and the previous form was filled out by two different people. (Polich Decl. Ex. 1069, at 5.)

**RESPONSE:** Undisputed.

116. Dr. Taylor refused to complete the forms again because the "[f]orms were completed entirely three times prior. The last form will be final and that is what applies." (Polich Decl. Ex. 1069, at 5.)

**RESPONSE:** Undisputed.

117. The interactive process ended after Carlson and Dr. Taylor did not respond to Catlin's requests for clarification about Dr. Taylor's recommendations, which led to a denial of Carlson's request to work 100% remote. (Catlin Decl. ¶ 41.)

**RESPONSE:** Disputed. Carlson relayed Catlin's request to her doctor's office and had no objection to further written questions; Dr. Taylor had already completed three questionnaires; Catlin sent a fourth questionnaire on August 10, 2021, requesting a response by August 17; DéFort and Hayes had discussed the "potential outcome" of denial the week before; and DHA's August 20, 2021 letter did not state any reason for the denial and treated Carlson's request as one for an exception to the telework policy "due to exceptional personal reasons." (PPFOF ¶¶ 64–70, 72, 73.) When DéFort approved the denial letter, he described the reason as "insufficient reliable evidence of a medical 'restriction,'" not a breakdown in communication. (PPFOF ¶ 71.)

118. On August 20, 2021, Catlin sent Carlson a letter notifying her that her accommodation request to work 100% at home was denied, and she should start working in the office on August 22, 2021. (Catlin Decl. ¶ 42 Ex. 1011, at 2-3.)

**RESPONSE:** Undisputed that Catlin sent the letter. The letter treats Carlson's request as a request for an exception to the telecommuting policy "due to exceptional personal reasons," and gives no reason for the denial. (PPFOF ¶¶ 72, 73.) DéFort described the reason internally as "insufficient reliable evidence of a medical 'restriction.'" (PPFOF ¶ 71.)

119. Carlson was given or already had the following in-office accommodations: her own office where she could turn off fluorescent lights and use natural lighting, a new ergonomic chair, a workstation with a sit and stand desk. She could also request a footrest through her supervisor. (Catlin Decl. ¶ 43 Ex. 1012, at 2; DéFort Decl. ¶ 36; Carlson Dep. 70-71:23-3; 111:8-15.)

**RESPONSE:** Disputed. The private office, sit/stand workstation, virtual hearings at her desk, ability to use a lamp, and 50% telework were provided to all ALJs and were not accommodations made for Carlson. Carlson could control the lighting only in her own office; the hallways, common areas, support staff area, and bathrooms are lit by fluorescent lights. Carlson's office chair had been broken since 2013, contrary to DéFort's representation that she had an ergonomic chair. (PPFOF ¶¶ 45–50.)

120. When Carlson returned to the office, she complained that her new chair had not yet arrived to her office. The new chair was delivered the same day that she complained. (Carlson Dep. 55-56:16-11.)

**RESPONSE:** Disputed in part. Undisputed that a chair was delivered the day Carlson raised the issue. The chair was the same style of chair Carlson had before and did not help her, and Carlson located a different chair herself. (PPFOF ¶ 49.)

121. On October 7, 2021, Carlson wrote a message to Dr. Taylor, "Per my employer, I will be permitted to work from home if Dr. Taylor sates that I am medically restricted from working outside of my home due to my medical condition." (Carlson Dep. 116:4-9; Polich Decl. Ex. 1069, at 4.)

**RESPONSE:** Undisputed.

122. On October 11, 2021, Dr. Taylor faxed a response to Catlin recommending – rather than medically restricting – that Carlson not work in an office setting due to her health concerns previously listed. (Carlson Dep. 118-119:22-23; Polich Decl. Ex. 1070, at 1-3.)

**RESPONSE:** Undisputed.

## <u>Expectations after ALJs Returned to the Office</u>

123. Because the ALJs came into the office and there was more opportunity for informal in-person consults, DéFort began meeting with the ALJs biweekly in- person instead of weekly. (DéFort Decl. ¶ 35.)

**RESPONSE:** Undisputed.

124. Carlson was allowed to attend these meetings by video even when she was in the office. (DéFort Decl. ¶ 35.)

**RESPONSE:** Undisputed.

125. Calson's in-office days were generally the same as DéFort's and her office was next to DéFort's. (Carlson Dep. 49-50:25-1.)

**RESPONSE:** Undisputed.

126. Carlson reported that she would communicate with him "multiple times per day" when in person, as well as over Teams and email. (Carlson Dep. 50:1-9.)

**RESPONSE:** Undisputed.

127. Carlson did not follow the absence procedure policy upon her return to work in-office by not providing a reason for her absence. (DéFort Decl. ¶ 37.)

**RESPONSE:** Disputed. Carlson notified DéFort and staff before the start of the workday when she would be absent, and the policy did not require her to state the reason for her absence. (Carlson Dep. 131:15–132:10; DéFort Decl. Ex. 1046, at 5.)

128. On September 2, 2021, Carlson sent an email stating "I will be using PTO today, so please mark me out on Aces." Aces is DHA's online calendar of hearings, where DHA staff can see the scheduled hearings and planned absences of the ALJs. (DéFort Decl. ¶ 38 Ex. 1038, at 1.)

**RESPONSE:** Undisputed.

129. On September 23, 2021, Carlson sent an email stating "I will be using PTO today, 9/23." (DéFort Decl. ¶ 39 Ex. 1039, at 1.)

**RESPONSE:** Undisputed.

130. Carlson's emails did not include a reason for her PTO per the absence reporting policy. (DéFort Decl. 40 Ex. 1038, at 1 Ex. 1039, at 1.)

**RESPONSE:** Undisputed that the emails did not state a reason for Carlson's leave. Disputed that the absence-reporting policy required a reason. (Carlson Dep. 131:15–132:10.)

131. On Friday October 8, 2021, Carlson informed DéFort via email that she was feeling well enough to work and, therefore, was seeking permission to work 2 hours at home and would be taking 6 hours of paid time off. (DéFort Decl. ¶ 41 Ex. 1040, at 1.)

**RESPONSE:** Undisputed.

132. DéFort responded by instructing Carlson to take a full day of paid leave because Fridays are an in-office day. (DéFort Decl. ¶ 42 Ex. 1040, at 1.)

**RESPONSE:** Undisputed.

133. As stated in the DHA Administrator's return to work policy, "Friday in-office attendance is mandatory for all AWP agreements." (DéFort Decl. ¶ 42 Ex. 1036, at 9.)

**RESPONSE:** Undisputed.

134. DéFort would have sent that email to any ALJ making the same request. DéFort could not make an exception just for Carlson. (DéFort Decl. ¶ 43.)

**RESPONSE:** Undisputed that DéFort so declares.

135. Carlson recalls that the emails between her and DéFort about how she used her sick time led to increased tension between her and DéFort, as well as increased stress and anxiety. (Carlson Dep. 49:13-22.)

**RESPONSE:** Undisputed.

136. Carlson believes that some in-person discussions caused her anxiety, though she cannot recall any specific conversations that caused her anxiety. (Carlson Dep. 50:14-17.)

> **RESPONSE:** Disputed in part. Undisputed that Carlson could not recall the content of specific in-person conversations. Carlson testified to specific conduct by DéFort that caused her anxiety, including looking through her office window to check on her and repeatedly calling her, and calling her parents' home, on a day she had off for a medical appointment. (Carlson Dep. 50:14–52:22, 53:20–55:6; PPFOF ¶¶ 80–82.)

137. During the week of November 3 and 4, 2021, a number of ALJs were attending a virtual conference. (DéFort Decl. ¶ 44.)

**RESPONSE:** Undisputed.

138. On November 4, 2021, DéFort emailed Carlson to ask where she was working because it was an in-office day. (DéFort Decl. ¶ 44 Ex. 1041, at 1.)

**RESPONSE:** Undisputed.

139. On November 3, 2021, DéFort denied a different ALJ's request to work from home to watch the virtual conference on Friday. (DéFort Decl. ¶ 44.)

**RESPONSE:** Undisputed.

140. After receiving DéFort email, Carlson came to the office. (DéFort Decl. ¶ 44.)

**RESPONSE:** Undisputed.

141. DéFort understands that Carlson thinks DéFort looked into her window to see if she was there, which caused her anxiety. (DéFort Decl. ¶ 45; Carlson Dep. 50:14-24.)

**RESPONSE:** Undisputed.

142. DéFort does not recall doing this, but because DéFort's office was next to Carlson's office, there was no way to avoid passing her office door when he needed to leave or return to his office. (DéFort Decl. ¶ 46.)

**RESPONSE:** Undisputed that DéFort does not recall doing so. Carlson testified that DéFort stepped out of his office, stood in front of her door, crouched down, and looked through the gaps between the stickers on her narrow window to see whether she was in the office, and that hers was the only window he looked through. (PPFOF ¶ 80.)

143. DéFort may have occasionally looked towards Carlson's window as he either left or entered his office. (DéFort Decl. ¶ 46.)

**RESPONSE:** Disputed. (PPFOF ¶ 80.)

144. When in the office, ALJs and staff interact with each other, which includes looking in a person's office window to see if they are busy before stopping to talk. (DéFort Decl. ¶ 46.)

**RESPONSE:** Undisputed that DéFort so declares.

**<u>Carlson's Request for Remote Work: Anxiety Interacting with Management</u>**

145. Around December 23, 2021, Catlin received another reasonable accommodation request in the form of a doctor's note from Carlson's mental health care provider, Dr. Mervin Langley. (Catlin Decl. ¶ 44 Ex. 1013, at 1.)

**RESPONSE:** Undisputed.

146. Dr. Langley's note stated: "Ms. Carlson is suffering from a psychological impairment that currently limits her ability to manage many major life activities and is a disabling condition. Due to this impairment, it is my professional opinion that Ms. Carlson is not currently able to work outside of her home. She is able to continue working virtually." (Catlin Decl. ¶ 45 Ex. 1013, at 1.)

**RESPONSE:** Undisputed.

147. Carlson admits that Dr. Langley's note is the basis for her work from home request in December 2021 for anxiety and depression. (Carlson Dep. 122:4-7; 125:1-22.)

**RESPONSE:** Undisputed.

148. Dr. Langley's medical note from November 8, 2021 further states: "[Carlson] is complaining of/requesting evaluation for depression and anxiety over her work primarily. She has been trying to get some work restrictions, is working virtual 50%. She is having a lot of anxiety now about working at the office, is fine working from home[.]" (Carlson Dep. 120-121:21-15; Polich Decl. Ex. 1069, at 2-3.)

**RESPONSE:** Undisputed.

149. Carlson recalls that she saw Dr. Langley to address stress, anxiety, and depression she attributed to her work and perceived conflict with her supervisor. (Carlson Dep. 122-123:20-6.)

**RESPONSE:** Undisputed, except that Carlson testified to conflict with her supervisor, not "perceived" conflict. (Carlson Dep. 122:20–123:6.)

150. On December 29, 2021, Catlin began the interactive process by sending a medical questionnaire to Carlson to give to Dr. Langley. (Catlin Decl. ¶ 46 Ex. 1014, at 1-8.)

**RESPONSE:** Undisputed.

151. Carlson was allowed to return to 100% telework while they engaged in the interactive process. (Catlin Decl. ¶ 48 Ex. 1015, at 1.)

**RESPONSE:** Undisputed.

152. On January 12, 2022, Carlson emailed Catlin asking if Catlin received Dr. Langley's completed medical questionnaire. Carlson wrote: "I would also note that the December 22, 2021 letter from my provider does already address many of the questions set forth in your questionnaire." (Catlin Decl. ¶ 49 Ex. 1015, at 1.)

**RESPONSE:** Undisputed.

153. Catlin told Carlson that she had not received the questionnaire and explained that interactive process was the same for any accommodations request. (Catlin Decl. ¶ 50 Ex. 1015, at 1.)

**RESPONSE:** Undisputed.

154. On January 19, 2022, Catlin received Dr. Langley's response to the medical questionnaire (dated January 14, 2022.) (Catlin Decl. ¶ 51 Ex. 1014, at 5-7.)

**RESPONSE:** Undisputed.

155. Dr. Langley stated Carlson's anxiety was not permanent but may last 12 months or longer, and that: "The commute itself is a source of increased anxiety. Patient's concerns about management are an obstacle. Continued remote work in a perceived safe environment may help to rebuild the patient's self-efficacy and return to in-person work." (Catlin Decl. ¶ 51 Ex. 1014, at 5-7.)

**RESPONSE:** Undisputed.

156. Catlin discussed Carlson's request with management and determined that she needed more information from Dr. Langley because, based on Dr. Langley's responses, it was unclear whether Carlson was able to perform the full scope of her job responsibilities if she was restricted from interacting with her manager. (Catlin Decl. ¶ 52.)

**RESPONSE:** Undisputed that Catlin so declares. Dr. Langley reported that Carlson had no difficulty performing the full scope of her job responsibilities by telework or Microsoft Teams. (PPFOF ¶ 86.)

157. The length of an employee's commute does not support medical accommodation because the distance an employee lives from work is completely within her discretion. (Catlin Decl. ¶ 53.)

**RESPONSE:** Disputed. This paragraph states Catlin's opinion, not a fact about Carlson. Carlson's requests were based on her medical conditions and her providers' documentation, not on the distance she lives from work. (Catlin Decl. Ex. 1003; PPFOF ¶¶ 36, 38, 39, 84–87.)

158. On March 3, 2022, Catlin sent an email to Carlson with a follow-up questionnaire for Dr. Langley to understand why Carlson perceived working in the office as an unsafe environment. (Catlin Decl. ¶ 54 Ex. 1016, at 2-4.)

**RESPONSE:** Undisputed.

159. On March 25, 2022, Dr. Langley responded that Carlson was physically safe in the office, but "she experiences substantially more anxiety and perceived criticism from managers at the office." (Catlin Decl. ¶ 55 Ex. 1016, at 2.)

**RESPONSE:** Undisputed.

160. Dr. Langley stated that the job function Carlson had trouble performing was direct interaction with managers. (Catlin Decl. ¶ 56 Ex. 1016, at 2.)

**RESPONSE:** Undisputed.

161. Dr. Langley's response to the follow-up questionnaire did not clarify whether Carlson had a disability that medically restricted her from working outside the home. (Catlin Decl. ¶ 57.)

**RESPONSE:** Disputed. Dr. Langley reported that Carlson could perform the full scope of her job responsibilities by telework but had severe anxiety during in-office interactions with her managers. (PPFOF ¶ 86.)

162. The medical documentation indicated Carlson could work in-office if she had limited interaction with her manager. (Catlin Decl. ¶ 57.)

**RESPONSE:** Disputed. Dr. Langley stated that proposed in-office changes "may be helpful if the following concerns can be addressed," and that any change might be phased in over a three-month period; he did not state that Carlson could work in the office if she had limited interaction with her manager. (PPFOF ¶¶ 89, 90.)

163. On April 28, 2022, Catlin sent Carlson a third questionnaire to be completed by Dr. Langley. (Catlin Decl. ¶ 59 Ex. 1017, at 2.)

**RESPONSE:** Undisputed.

164. This questionnaire was intended to address whether HR could take steps to help Carlson's anxiety in interacting with her manager. (Catlin Decl. ¶ 59 Ex. 1017, at 2.)

**RESPONSE:** Undisputed.

165. On May 16, 2022, Dr. Langley faxed the completed questionnaire to Catlin which stated HR could take steps to assist Carlson in interacting with her manager by moving her office and limiting her direct contact with him. (Catlin Decl. ¶ 60 Ex. 1017, at 3.)

**RESPONSE:** Disputed as incomplete. Dr. Langley stated that moving Carlson's office and changing her supervisor "may be helpful if the following concerns can be addressed," including a phase-in over three months and the separate issue of fluorescent lighting and her migraines. (PPFOF ¶ 89.)

166. Dr. Langley further advised her return to work in the office was likely. (Catlin Decl. ¶ 60 Ex. 1017, at 3.)

**RESPONSE:** Undisputed that Dr. Langley rated Carlson's eventual return to in-office work as likely. He did not provide a date by which she could return. (PPFOF ¶ 90.)

167. Dr. Langley never stated Carlson medically required a permanent 100% telework accommodation. (Catlin Decl. ¶ 60 Ex. 1017, at 3.)

**RESPONSE:** Undisputed that Dr. Langley did not use the word "permanent." Dr. Langley stated that Carlson was not currently able to work outside of her home and that her condition may last twelve months or longer. (PPFOF ¶¶ 84, 85.)

168. Based on Dr. Langley's responses, DHA approved a temporary telework accommodation. (Catlin Decl. ¶ 61.)

**RESPONSE:** Undisputed that DHA approved temporary telework. Disputed to the extent this paragraph implies that the approval was consistent with Dr. Langley's responses; DHA ended the arrangement on July 31, 2022, without a phase-in, although Dr. Langley reported in January 2022 that Carlson's condition may last twelve months or longer. (PPFOF ¶¶ 85, 89–91.)

169. Between December 2021 to August 2022, DHA allowed Carlson to work from home because she submitted a second reasonable accommodation request to Human Resources. (DéFort Decl. ¶ 47; Catlin Decl. ¶¶ 48, 62.)

**RESPONSE:** Undisputed.

170. On June 1, 2022, Catlin emailed Carlson a notice of approval letter advising that her management approved a 100% telework accommodation until July 31, 2022. (Catlin Decl. ¶ 62 Ex. 1018, at 1.)

**RESPONSE:** Undisputed.

171. On August 1, 2022, Carlson would be required to work in-office 50% of the time per DHA policy. (Catlin Decl. ¶ 62 Ex. 1018, at 2-3.)

**RESPONSE:** Undisputed.

172. At this time, Carlson started taking intermittent FMLA leave at different times during the week for several weeks. (DéFort Decl. ¶ 49 Ex. 1042, at 1.)

**RESPONSE:** Undisputed.

173. On September 30, 2022, Carlson emailed "I will be using PTO." Carlson not only failed to provide any clarification, but she emailed using her personal email and stated her laptop was at the office. (DéFort Decl. ¶ 53 Ex. 1043, at 1.)

**RESPONSE:** Undisputed that Carlson sent the email from her personal account. Disputed that Carlson failed to provide clarification; she notified DéFort before the start of the workday and recorded the absence as FMLA leave in the State's self-service system, which management and HR can access. (PPFOF ¶¶ 96–98.)

174. Carlson's productivity had fallen in 2022, with 197 decisions written in 2020, 200 decisions written in 2021, and 111 decisions written in 2022. (DéFort Decl. ¶ 51.)

**RESPONSE:** Undisputed. Carlson returned to the office 50% of the time and began taking intermittent FMLA leave in August 2022. (PPFOF ¶¶ 13, 95.)

175. DéFort did not know when and how long Carlson would be off work, and had concerns about her health and workload. (DéFort Decl. ¶ 52.)

**RESPONSE:** Undisputed that DéFort so declares.

176. DéFort contacted Catlin and asked what, if any, questions he could ask Carlson. (DéFort Decl. ¶ 52 Ex. 1044, at 1.)

**RESPONSE:** Undisputed.

177. In response to Carlson's September 30, 2022, email, DéFort asked: "Is this an FMLA related absence for a flare-up, or is it a pre-scheduled medical appointment?" DéFort asked this question directly based on the HR policy and consultation with Catlin. (DéFort Decl. ¶ 54 Ex. 1043, at 1.)

**RESPONSE:** Undisputed.

178. When Carlson had not responded by mid-morning the following Monday, DéFort consulted with Catlin again and emailed Carlson stating: "Martha - I haven't heard back from you. So, I'm wondering whether you are working today. FYI – There is a hearing on your afternoon calendar (at 3pm). Please advise ASAP." (DéFort Decl. ¶ 55 Ex. 1045, at 1.)

**RESPONSE:** Undisputed.

179. Carlson responded to DéFort's email with the following: "Good morning, I received an e-mail from you on my personal e-mail wanting to know where I am. I am currently working from home, per my work from home arrangement and noted on Aces. In the event that I use PTO/FMLA, I have always notified you and DHA office staff of such prior to the start of the work day. I did not do so today as I am in work status." (DéFort Decl. ¶ 56 Ex. 1046, at 5.)

**RESPONSE:** Undisputed.

180. Catlin sent DéFort the HR policy on interacting with employees while on FMLA, which included a list of questions DéFort could ask. (DéFort Decl. ¶ 57 Ex. 1047, at 1.)

**RESPONSE:** Undisputed.

181. DéFort responded to Carlson, stating: "Martha - First, I am glad to know that you are working today. Did you get your DHA laptop? And do you have what you need for today's hearing at 3PM? Second, you still have not advised me of the nature of Friday's absence. The email that you initiated from your personal email account provided no detail on whether this was FMLA related. So, I'm following up again. What was the specific reason for your absence? When did you first learn that you would need to be absent from work? Thanks, Eric." (DéFort Decl. ¶ 58 Ex. 1046, at 4.)

**RESPONSE:** Undisputed.

182. Carlson responded to tell DéFort she was working from home, also saying: "I do not believe I am legally obligated to tell you the 'specific reason for my absence,' as you requested, other than it is FMLA related and protected by law. I am copying Jessica Catlin from HR on this email so she is aware of our communications." (DéFort Decl. ¶ 59 Ex. 1046, at 4.)

**RESPONSE:** Undisputed.

183. Carlson said that if DéFort looked into her office, he would see her laptop was not there and could assume she was working from home. (DéFort Decl. ¶ 60 Ex. 1046, at 4.)

**RESPONSE:** Undisputed.

184. DéFort responded that his questions did not ask for protected information and copied HR policy 302, which states the questions a supervisor is allowed to ask an employee on medical leave. (DéFort Decl. ¶ 61 Ex. 1046, at 2-3.)

> **RESPONSE:** Undisputed that DéFort so stated. Disputed that his questions did not call for protected information; the questions he identified included the "specific reason" for the absence, including "what symptoms or medically necessary treatment" prevented work, whether Carlson would see a doctor, and whether she had suffered from the condition before. HR had advised DéFort to ask only whether the absence was FMLA-related, and to continue with further questions only if Carlson stated that it was not FMLA; Carlson had recorded the absence as FMLA leave. (PPFOF ¶¶ 96, 97, 100.)

185. DéFort copied the following into his email: HR Policy 302 provides the following applicable provisions: Employees must follow usual and customary call-in procedures and answer questions related to the time off from work including but not limited to: reason, duration, what job duties the employee will not be able to perform during this time off from work, expected return to work date, and any restrictions or limitations upon the return to work. An employee's refusal or failure to follow call-in procedures or to answer reasonable, job-related questions about his or her ability to perform essential job functions, with or without accommodation, may result in a delay or denial of certain job-protected leave or may result in discipline up to and including termination. Employees do not need to disclose confidential medical information but may need to provide signs or symptoms that contribute to their absence. While employees are not required to share confidential medical information with supervisors, managers, or non-supervisory staff, employees are required to provide enough information to enable management to determine whether the leave may be FMLA or non- FMLA related. (DéFort Decl. ¶ 62 Ex. 1046, at 2-3)

> **RESPONSE:** Undisputed.

186. DéFort explained that his questions on September 30 were approved by Human Resources and then DéFort wrote the following: "Was this absence for a 'flare-up,' or was it a pre-scheduled medical appointment? (Note - The term "flare-up" did not reveal any detail about your actual symptoms. So you can answer that question [in the affirmative or negative] without getting into any details.)" And then DéFort asked when Carlson first learned that she would need to be absent from work. (DéFort Decl. ¶ 63 Ex. 1046, at 2-3.)

> **RESPONSE:** Undisputed that DéFort so wrote. HR's advice on September 30 was to ask whether the absence was "an FMLA related absence for a flare-up, or a pre-scheduled medical appointment," and to "continue with further questions" only "[i]f she states this is not FMLA." Carlson had recorded the absence as FMLA leave in the State's system. (PPFOF ¶¶ 96, 97.)

187. Carlson responded, "I have not refused to follow call-in procedures or answer questions related to work. Therefore, your threat of termination is unfounded and uncalled for." (DéFort Decl. ¶ 64 Ex. 1046, at 1.)

> **RESPONSE:** Undisputed.

188. DéFort never threatened termination based on Carlson's lack of response to DéFort's email. (DéFort Decl. ¶ 65 Ex. 1046, at 2.)

**RESPONSE:** Disputed. DéFort told Carlson she "must answer" his questions and quoted a policy stating that a refusal to answer may result in discipline up to and including termination. (PPFOF ¶ 100.)

189. DéFort only copied the HR 302 policy which referenced potential consequences when an employee refuses to answer the questions listed in HR's policy. (DéFort Decl. ¶ 65 Ex. 1046, at 2.)

**RESPONSE:** Undisputed that DéFort copied the policy language into his email. (PPFOF ¶ 100.)

190. Carlson also asked whether management had the same reporting requirements for all employees, and accused management of using basic PTO reporting policies to harass her. (DéFort Decl. ¶ 66 Ex. 1046, at 1.)

**RESPONSE:** Undisputed.

191. DéFort contacted HR Employment Relations Specialist Debra Heiser and upper management for help responding to Carlson's emails. (DéFort Decl. ¶ 67 Ex. 1048, at 4.)

**RESPONSE:** Undisputed. In the same correspondence, DéFort acknowledged to HR that "[i]n this latest email, Martha provides the requested information." (PPFOF ¶ 102.)

192. Heiser conducted a fact-finding meeting regarding Carlson's refusal to follow DéFort's instructions regarding absence reporting on September 30, 2022 and her discourteous emails on October 3 and 4, 2022. DéFort attended the meeting. (DéFort Decl. ¶ 68 Ex. 1048, at 1 Ex. 1049.)

**RESPONSE:** Undisputed that Heiser conducted a fact-finding meeting attended by DéFort. Disputed that Carlson refused to follow instructions; Carlson reported her absence before the workday, recorded it as FMLA leave, and provided the information DéFort requested. (PPFOF ¶¶ 96, 101, 102.)

193. During the fact-finding meeting, Carlson exhibited the same discourteous behavior and made inaccurate statements regarding the email correspondence between September 30, 2022, and October 4, 2022. (DéFort Decl. ¶ 69 Ex. 1049.)

**RESPONSE:** Disputed. (PPFOF ¶ 106; Carlson Dep. 130:17–131:6.)

194. DéFort issued Carlson a non-disciplinary letter of expectation on October 17, 2022. (DéFort Decl. ¶ 70 Ex. 1050, at 4-5.)

**RESPONSE:** Undisputed that DéFort issued the letter. The letter is retained in Carlson's personnel file, cannot be removed under HR's interpretation of Act 10, warns that failure to meet its expectations may result in discipline up to and including termination, and was relied upon in Carlson's 2023 performance evaluation. (PPFOF ¶¶ 105–108.)

195. The letter advised Carlson that these expectations are "given to you as a reminder of the importance of the absence reporting procedures, following instructions, refraining from making false and inaccurate statements, and being respectful in your communications." (DéFort Decl. ¶ 71 Ex. 1050, at 4.)

**RESPONSE:** Undisputed that the letter contains the quoted language. (PPFOF ¶ 105.)

196. DéFort also provided Carlson with a copy of the work rules she signed on January 30, 2020, because Carlson stated during the fact-finding meeting that she could not remember signing any work rules. (DéFort Decl. ¶ 72 Ex. 1050, at 2.)

**RESPONSE:** Undisputed.

197. Before September 30, 2022, DéFort allowed Carlson to work from home on two occasions because she provided a detailed explanation for her request to work from home, and the DHA allowed ALJs to work from home under temporary and discrete circumstances that were not likely to reoccur. (DéFort Decl. ¶ 73.)

**RESPONSE:** Undisputed.

198. On August 19, 2022, DéFort allowed Carlson to work from home because her home garage door was not working, and she requested to work from home while the repair service fixed her garage. (DéFort Decl. ¶ 74 Ex. 1051, at 2.)

**RESPONSE:** Undisputed.

199. DéFort allowed Carlson to work from home because the circumstance qualified as a temporary and discrete situation that was unlikely to reoccur. (DéFort Decl. ¶ 74 Ex. 1051, at 1.)

**RESPONSE:** Undisputed.

200. On September 19, 2022, DéFort allowed Carlson to work from home on Friday, September 23, 2022, because Carlson provided a detailed explanation of an important medical appointment scheduled that Friday, which was an in-office day. (DéFort Decl. ¶ 75 Ex. 1052, at 1.)

**RESPONSE:** Undisputed.

201. DéFort allowed Carlson to work from home because the circumstance qualified as a temporary and discrete situation that was unlikely to reoccur. DéFort did ask Carlson to avoid scheduling appointments on Fridays. (DéFort Decl. ¶ 75 Ex. 1052, at 1.)

**RESPONSE:** Undisputed.

202. Carlson alleged she experienced panic and anxiety due to interactions with her supervisors in October 2022. (Carlson Dep. 128:5-18.)

**RESPONSE:** Undisputed.

## One-on-One Meetings between DéFort and Carlson

203. Carlson attended the biweekly staff meetings virtually because she worked remotely, but did not participate as much because most of the ALJs could interact in-person. (DéFort Decl. ¶ 77.)

**RESPONSE:** Undisputed that DéFort so declares.

204. Because Carlson worked remotely, DéFort was concerned about her isolation, lack of participation, and work productivity. (DéFort Decl. ¶ 78.)

**RESPONSE:** Undisputed that DéFort so declares. Carlson was not working remotely full time when the weekly meetings began in May 2023; she was then working in the office half of the time. (PPFOF ¶¶ 13, 24, 119.) DéFort's August 2021 evaluation, covering a period in which Carlson worked almost entirely from home, described her as "one of the more productive Corrections unit judges across the entire division," and his 2024 review, covering her first months of full-time telework, rated her "Exceptional" as a Corrections ALJ. (PPFOF ¶¶ 15, 111.) Carlson has regular contact with parties, agents, colleagues, and support staff throughout the workday and does not feel isolated. (PPFOF ¶ 25.)

205. At times, Carlson's productivity in issuing written decisions had fallen below other ALJs. (Hayes Decl. ¶ 16.)

**RESPONSE:** Undisputed that Hayes so declares. Hayes identifies no period or data supporting the statement. In 2023, seven of fourteen Corrections ALJs completed fewer than Hayes's stated goal of 220 revocation decisions, and three completed fewer total decisions than Carlson. (Hayes Decl. ¶ 16; PPFOF ¶¶ 16, 17.)

206. After a discussion, Hayes asked DéFort to have weekly meetings with Carlson to foster engagement and productivity. (DéFort Decl. ¶ 79; Hayes Decl. ¶ 17.)

**RESPONSE:** Undisputed that Hayes asked DéFort to hold weekly meetings with Carlson. DéFort announced the meetings by email on May 3, 2023, two days after Carlson's May 1, 2023 accommodation request, citing only her "year-to-date decision totals" and the need to "increase [her] productivity." (PPFOF ¶ 119.) In 2024, DOA told the ERD that the meetings were started "[i]n order to correct" Carlson's 2022 productivity "deficiency." (PPFOF ¶ 120.)

207. These meetings enable DéFort to check on Carlson's productivity, give her an opportunity to express work concerns or questions, and help to reduce isolation. (DéFort Decl. ¶ 79; Hayes Decl. ¶ 17.)

**RESPONSE:** Undisputed that DéFort and Hayes so declare. Disputed that the meetings were intended to reduce isolation: DéFort's May 3, 2023 email announcing them cited only Carlson's decision totals and productivity; DOA told the ERD in 2024 that the meetings were started "[i]n order to correct" a productivity "deficiency"; and Carlson has regular contact with parties, agents, colleagues, and support staff throughout the workday and does not feel isolated. (PPFOF ¶¶ 25, 119, 120.)

208. These meetings vary in length from 5 to 30 minutes, depending on what questions or issues arise. (DéFort Decl. ¶ 80.)

**RESPONSE:** Undisputed that DéFort so declares.

209. Carlson asks thoughtful questions and DéFort and Carlson have good discussions. DéFort tries to address Carlson's concerns and keep her engaged in the work environment. (DéFort Decl. ¶ 80.)

**RESPONSE:** Undisputed that DéFort so declares.

**<u>Carlson's Request for Remote Work: Long Covid</u>**

210. Carlson contracted Covid-19 in late February 2023. (Carlson Dep. 16:19-24.)

**RESPONSE:** Undisputed.

211. On March 24, 2023, Catlin received a doctor's note that Carlson was suffering from post-Covid-19 syndrome ("long Covid") and needed to work from home until further evaluation. (Catlin Decl. ¶ 63 Ex. 1019, at 1.)

**RESPONSE:** Undisputed.

212. Catlin did not think this doctor's note served as a request for a reasonable accommodation, but instead thought Carlson was requesting to take medical leave. (Catlin Decl. ¶ 64.)

**RESPONSE:** Undisputed that Catlin so declares. Disputed that the note could reasonably be understood as a request for leave. On March 25, 2023, Carlson wrote to Catlin that she was "hereby requesting to work from home on a full-time basis per the recommendation of my physician," and on March 27 she wrote: "To be clear, I am not requesting time off of work; I am requesting that DHA permit me to work from home full time." Management itself described the note as "what seems to be Martha's medical accommodation request." (PPFOF ¶¶ 113, 114.)

213. It is Catlin's understanding that Carlson now alleges that her March 24, 2023 doctor's note was a reasonable accommodation request that was denied. (Catlin Decl. ¶ 65.)

**RESPONSE:** Undisputed.

214. Catlin never treated the March 24, 2023 doctor's note as a reasonable accommodation request nor did Carlson follow-up and ask to engage in the interactive process. (Catlin Decl. ¶ 66.)

**RESPONSE:** Disputed. Carlson expressly requested full-time telework on March 25 and 27, 2023, and again on April 4, 2023; management described the note as an accommodation request; and on April 5, 2023, Catlin circulated a draft letter denying the request because Carlson's documentation did not establish a "work restriction." (PPFOF ¶¶ 113–116.)

215. On April 4, 2023, Carlson requested to work 100% from home. Carlson did not submit an RA request form but instead emailed Hayes and DéFort. (DéFort Decl. ¶ 81 Ex. 1053, at 1-2.)

**RESPONSE:** Undisputed that Carlson emailed Hayes and DéFort. Policy #402 permits an accommodation request by email, and Carlson asked in her email whether she needed to file another HR1120 form. (PPFOF ¶¶ 29, 116.)

216. Shortly thereafter, DéFort met with Catlin and Hayes to discuss Carlson's email. (DéFort Decl. ¶ 82.)

**RESPONSE:** Undisputed.

217. On April 10, 2023, Catlin submitted an FMLA application on Carlson's behalf and it was approved. (DéFort Decl. ¶ 83 Ex. 1054, at 1.)

**RESPONSE:** Undisputed that Catlin submitted an FMLA application. The application was for Carlson's absence on February 9, 2023, not a response to her April 4, 2023 request to work from home. (PPFOF ¶¶ 116, 117.)

218. On May 1, 2023, Carlson submitted a reasonable accommodation form requesting to work remotely because she had long Covid. (Catlin Decl. ¶ 67 Ex. 1020, at 1-3; DéFort Decl. ¶ 76.)

**RESPONSE:** Undisputed.

219. Specifically, Carlson stated she needed to 100% telework to take breaks as needed, administer medication, and avoid migraine triggers. (Catlin Decl. ¶ 67 Ex. 1020, at 1-3; DéFort Decl. ¶ 76.)

**RESPONSE:** Undisputed.

220. Carlson was allowed to work from home while Catlin and Carlson engaged in the interactive process. (Catlin Decl. ¶ 68.)

**RESPONSE:** Undisputed.

221. On June 6, 2023, Catlin sent a letter and medical questionnaire to Carlson to give to her medical provider. (Catlin Decl. ¶ 69 Ex. 1021, at 1-8.)

**RESPONSE:** Undisputed. Catlin's letter instructed Dr. Taylor to "address your diagnosis of Long Covid only." (PPFOF ¶ 121.)

222. On June 12, 2023, Catlin received the medical questionnaire from Dr. Taylor dated June 11, 2023, stating Carlson required natural lighting to work in- office and to take breaks as needed. (Catlin Decl. ¶ 71 Ex. 1022, at 2-5.)

**RESPONSE:** Undisputed.

223. Dr. Taylor wrote that Carlson could access public places and was not medically restricted from working outside the home. Dr. Taylor did not know the duration of the accommodation. (Catlin Decl. ¶ 71 Ex. 1022, at 2-5.)

**RESPONSE:** Undisputed that Dr. Taylor so wrote. Dr. Taylor deferred to Dr. Langley, who on July 12, 2023 recommended "mostly virtual/remote work" for the long term and wrote: "Limit schedule outside of home to no more than once per week for now but with support of an advocate up to two days." (PPFOF ¶¶ 122–124.)

224. Based on Carlson's medical restrictions, Catlin sent her a modified accommodation approval letter on August 2, 2023. (Catlin Decl. ¶ 72 Ex. 1023, at 2- 3.)

**RESPONSE:** Disputed as stated. The August 2, 2023 letter denied Carlson's request because her documentation did not establish a "work restriction" from the 50% policy, although Dr. Langley's July 12, 2023 questionnaire limited her work outside the home to no more than once per week (two days with an advocate). (PPFOF ¶¶ 123, 124, 126.)

225. Carlson was granted the following accommodations: natural lighting, specifically moving to an office with a window, reduced in-person meetings, and break time during the workday 1-2 times per hour lasting 5-10 minutes. The letter further advised that breaks may require discussion with management. (Catlin Decl. ¶ 73 Ex. 1023, at 2.)

**RESPONSE:** Disputed. The letter did not grant break time, stating that "more conversation is needed"; Carlson's window resulted from her work unit's move; and reduced in-person meetings were available to any employee without an accommodation. As of October 2023, the break issue remained unresolved, and DéFort had told Hayes that he "won't commit to anything." (PPFOF ¶¶ 127–130.)

226. The letter further notified Carlson that her medical documentation did not establish a "work restriction" from 50% in-office telework policy. (Catlin Decl. Ex. 1023, at 2-3.)

**RESPONSE:** Undisputed that the letter so states. Dr. Langley's July 12, 2023 questionnaire limited Carlson's work outside the home to no more than once per week (two days with an advocate), while DHA's policy required in-office work 50% of the time. (PPFOF ¶¶ 123, 124; DPFOF ¶¶ 45–46.)

<u>**Transient Global Amnesia Incident**</u>

227. On August 3, 2023, just before 9 a.m., DéFort arrived at work and saw a State Capitol Police squad Sports Utility Vehicle (SUV) parked in the loading dock entrance to the building where employees enter the from the parking lot. (DéFort Decl. ¶ 86.)

**RESPONSE:** Undisputed.

228. As DéFort approached the building, he saw Carlson in the passenger seat of the police SUV. (DéFort Decl. ¶ 87.)

**RESPONSE:** Undisputed.

229. DéFort walked past the vehicle toward the building's entrance and spoke with Carlson's boyfriend, Todd Angst, who is a State Capitol Police Officer. (DéFort Decl. ¶ 88.)

**RESPONSE:** Undisputed.

230. Officer Angst expressed concern that Carlson could not remember how she got to work that day and it seemed to him that Carlson was having stroke symptoms. Officer Angst told DéFort he planned to take Carlson to a hospital to get checked out. (DéFort Decl. ¶ 88.)

**RESPONSE:** Undisputed.

231. Consistent with Officer Angst's summary, State Capitol Police (SCP) Sgt. Joseph Bahr notified DéFort that Carlson was in the SCP's office at 8:32 AM, and that Officer Angst said Carlson was "very confused and doesn't know why she is here." (DéFort Decl. ¶ 89 Ex. 1055, at 1.)

**RESPONSE:** Undisputed.

232. Sgt. Bahr told DéFort that the SCP called the Milwaukee Fire Department (MFD) to check Carlson out and at 8:43 AM the MFD was on scene and performing the check-up. (DéFort Decl. ¶ 89 Ex. 1055, at 1.)

**RESPONSE:** Undisputed.

233. Carlson was scheduled to preside over revocation hearings that morning and afternoon. (DéFort Decl. ¶ 90 Ex. 1056, at 2.)

**RESPONSE:** Undisputed.

234. Given that Carlson did not remember how she got to work, did not know why she was at the building, and seemed to have stroke-like symptoms, it appeared that Carlson was severely disoriented. (DéFort Decl. ¶ 91.)

**RESPONSE:** Undisputed that DéFort so declares.

235. Catlin learned that Carlson experienced transient global amnesia (TGA) when she arrived to work on August 3, 2023, which caused Carlson to become disoriented and required emergency treatment. (Catlin Decl. ¶ 74.)

**RESPONSE:** Undisputed.

236. Carlson states the TGA episode started before she arrived at work, but she cannot remember anything else about the episode before being seen in the emergency room. (Carlson Dep. 133:20-25:134:1-8.)

**RESPONSE:** Undisputed.

237. On August 3, 2023, Catlin informed DéFort that "A return to work note will be required before she can come back to her regular duties." More importantly, Catlin notified DéFort that she would need to review the documentation for completeness and then she would "report" to me "when [Carlson] can return to work (in-office/telework) and if there are any restrictions related to her illness." (DéFort Decl. ¶ 93 Ex. 1056, at 1.)

**RESPONSE:** Undisputed.

238. Because Carlson was disoriented at work during the TGA, Catlin needed further medical documentation that Carlson was fit to return to work as an ALJ. (Catlin Decl. ¶ 76.)

**RESPONSE:** Undisputed that Catlin so declares.

239. This is standard procedure for any employee that has a medical emergency. Catlin emailed Carlson a standard HR fitness for duty form to be completed by her doctor. (Catlin Decl. ¶ 76, Ex. 1025, at 1-2.)

**RESPONSE:** Undisputed that Catlin emailed Carlson a form. The form was an FMLA fitness-for-duty certification, and Catlin's letter to Carlson's provider is dated August 9, 2023 and asked about changes in Carlson's "mood or emotions." (PPFOF ¶¶ 138–140.)

240. At 7:16 PM on August 3, 2023, Carlson sent DéFort an email with an Emergency Services Excuse Form – retroactively excusing her from work that day and the following day. (DéFort Decl. ¶ 92 Ex. 1057, at 1-2.)

**RESPONSE:** Undisputed.

241. On August 4, 2023, at 8:15 a.m., Catlin emailed Carlson advising her that she was aware that Carlson received medical attention the previous day and asked for any return to work documentation from a healthcare provider. (DéFort Decl. Ex. 1059, at 2.)

**RESPONSE:** Undisputed.

242. In response, Carlson sent a one sentence doctor's note stating that she could return to work on Monday, August 7, 2023. (Catlin Decl. ¶ 75 Ex. 1024, at 1; DéFort Decl. ¶ 95.)

**RESPONSE:** Undisputed.

243. DéFort then consulted with Catlin and she instructed DéFort to tell Carlson that the note that Carlson provided was not sufficient to allow her to return to work status on Monday August 7, 2023, and that HR would be reaching out to Carlson with documentation that will need to be completed. (DéFort Decl. ¶ 94 Ex. 1057, at 1.)

**RESPONSE:** Undisputed.

244. At 3:18 p.m., DéFort emailed Carlson advising her that HR said that the note that Carlson provided was insufficient to allow her to return to work status on August 7. (DéFort Decl. ¶ 94 Ex. 1059, at 1-2.)

**RESPONSE:** Undisputed. The note Carlson had provided at that time was the emergency room's excuse form for August 3 and 4. At 5:43 p.m. that day, Carlson provided Dr. Taylor's note certifying that she could return to regular work on August 7. (PPFOF ¶¶ 132–134.)

245. On August 7, 2023, Hayes notified Carlson that DHA consulted with HR and determined that there was a need to determine whether Carlson could safely perform the essential functions of her position. (DéFort Decl. ¶ 96 Ex. 1060, at 1.)

**RESPONSE:** Undisputed.

246. On August 8, 2023, Carlson emailed DéFort, stating that she would no longer be using leave for August 11, 2023, and she had removed the block on her calendar. (Catlin Decl. Ex. 1026, at 1.)

**RESPONSE:** Undisputed.

247. DéFort forwarded this email to Catlin, stating, "Martha seems to be under the impression that she is back at work. Have you given her instructions on reporting before a fitness for duty determination has been made?" (Catlin Decl. Ex. 1026, at 1.)

**RESPONSE:** Undisputed.

248. Catlin does not have direct authority over employees, so as Carlson's supervisor, DéFort needed to advise Carlson to take leave until she was declared fit for duty. (Catlin Decl. ¶ 77 Ex. 1026, at 1.)

**RESPONSE:** Undisputed that Catlin so declares.

249. During the week of August 7, 2023, HR conducted its review of whether Carlson could return to work. That review was concluded on Friday August 11, 2023. (DéFort Decl. ¶ 97.)

**RESPONSE:** Disputed. Catlin's letter to Carlson's provider is dated August 9, 2023, and the review ended when HR accepted Dr. Taylor's August 11, 2023 certification without further evaluation. (PPFOF ¶¶ 138, 141.)

250. On August 10, 2023, Catlin advised Carlson that she would need to use personal leave beginning August 7, 2023. (DéFort Decl. ¶ 98 Ex. 1061, at 1-2.)

**RESPONSE:** Undisputed.

251. On August 10, 2023, Carlson filed an HR grievance requesting reimbursement for the 8 hours she worked on August 7, 2023, and the 2 hours she worked on August 8, 2023, though she had not yet been cleared to return to work by HR. (DéFort Decl. ¶ 102 Ex. 1061, at 1-2.)

**RESPONSE:** Undisputed.

252. On August 15, 2023, Catlin instructed DéFort to (a) advise Carlson to enter leave time for the week of August 7, 2023, (b) give Carlson a deadline to do so as employees will be locked out of PeopleSoft at noon on August 15, 2023, and (c) let Carlson know that if she doesn't enter the type of leave she wants to use by noon, it will be entered as sick leave on her behalf. (DéFort Decl. ¶ 99 Ex. 1062, at 1.)

**RESPONSE:** Undisputed.

253. DéFort instructed Carlson as DéFort was directed to do by Catlin. (DéFort Decl. ¶ 100 Ex. 1063, at 1.)

**RESPONSE:** Undisputed.

254. Despite those instructions, Carlson did not enter any leave for the week of August 7, 2023, to August 11, 2023. As a result, DéFort requested that HR enter the leave time for that week. (DéFort Decl. ¶ 101 Ex. 1064, at 1-2.)

**RESPONSE:** Undisputed.

255. On August 11, 2023, Dr. Taylor sent a letter stating Carlson could return to work. Catlin accepted this letter as a declaration that Carlson was fit for duty. Carlson did not undergo any further evaluation. (Catlin Decl. ¶ 78 Ex. 1027, at 4-7; Carlson Dep. 135:15-18.)

**RESPONSE:** Undisputed.

256. As a result of her grievance, HR allowed Carlson to have her paid leave time restored in recognition of her work on August 7 and August 8, 2023. (DéFort Decl. ¶ 103 Ex. 1065, at 1.)

**RESPONSE:** Undisputed that HR restored leave for the eight hours Carlson worked on August 7 and the two hours she worked on August 8. The remainder of that week was charged to Carlson's own leave. (PPFOF ¶ 142.)

257. On August 11, 2023, Carlson was able to return to work. (DéFort Decl. ¶ 104.)

**RESPONSE:** Undisputed.

258. Carlson believes that Hayes's and DéFort's decision to deny her reasonable accommodation requests and the emails sent regarding the TGA episode were "malicious and willful." (Carlson Dep. 86-87:20-10.)

**RESPONSE:** Undisputed.

**Carlson's January 2024 Request to Work from Home**

259. Carlson submitted updated documentation in December of 2023 and made another request to work 100% from home on January 2, 2024. (Catlin Decl. ¶ 79; DéFort Decl. ¶ 105.)

> **RESPONSE:** Undisputed that Carlson requested full-time telework on January 2, 2024, and that she submitted updated documentation in December 2023, which included Dr. Baur's December 15, 2023 letter faxed to HR. (PPFOF ¶¶ 20, 21.)

260. On February 20, 2024, Carlson's request for 100% telework was approved, and she remains on a 100% telework schedule. (Catlin Decl. ¶ 81 Ex. 1028, at 1; Carlson Dep. 135:24-25:136-1:2.)

**RESPONSE:** Undisputed.

261. DHA followed human resources recommendation to approve the 100% telework accommodation based on Carlson's medical documentation. (DéFort Decl. ¶ 106)

> **RESPONSE:** Undisputed that DHA approved full-time telework based on Carlson's medical documentation, which included Dr. Baur's January 17, 2024 statement that Carlson was not medically able to work in an office even one day per week. Substantially the same information from Dr. Taylor in 2021 and Dr. Langley in December 2021 did not result in approval. (PPFOF ¶¶ 21, 22, 59, 72, 84, 91.)

262. Catlin was not directly involved in this accommodation approval because she transferred to a different HR position, but Catlin has access to Carlson's approval letter. (Catlin Decl. ¶ 82.)

> **RESPONSE:** Undisputed that Catlin so declares. Catlin remained DOA's Medical & Reasonable Accommodation Coordinator for DHA until February 8, 2025. (PPFOF ¶ 19.)

**Additional Facts**

263. After DHA announced the hybrid telework policy, Carlson made multiple requests for 100% remote work as a disability accommodation. (Hayes Decl. ¶ 13.)

**RESPONSE:** Undisputed.

264. With each request, the basis for Carlson's request changed, and DHA provided Carlson with the in-office accommodations supported by medical documentation. Remote work was not initially supported by medical documentation. (Hayes Decl. ¶ 13; Catlin Decl. Ex. 1012, Ex. 1015, Ex. 1020.)

**RESPONSE:** Disputed. Dr. Taylor's 2021 questionnaires stated that Carlson was permanently restricted from working outside the home; Dr. Langley stated in December 2021 that Carlson was not currently able to work outside of her home; Dr. Taylor recommended in March 2023 that she work from home; and Dr. Langley limited her work outside the home in July 2023 to no more than once per week. DHA management treated each request as insufficient because it was a "recommendation, rather than a restriction." (PPFOF ¶¶ 43, 59, 60, 84, 112, 118, 124, 125.) In 2024, DHA approved full-time telework when Dr. Baur stated that Carlson was not medically able to work in an office even one day per week, substantially what Dr. Taylor had reported in 2021. (PPFOF ¶¶ 21, 22, 59.)

265. Carlson believes her accommodation request to 100% telework should have been approved in 2021 because her employer approved her fellow ALJ Kelly Cochrane's request to 100% telework. (Catlin Decl. ¶ 83; Carlson Dep. 139:15-17.)

**RESPONSE:** Undisputed.

266. Cochrane's request (relating to her husband's health) was not comparable to Carlson's request. (Catlin Decl. ¶ 84.)

**RESPONSE:** Disputed. Cochrane's request was not based on her own disability, and DHA allowed her to work from home 100% of the time. DéFort has separately stated that Cochrane's request was approved because it was supported by a "medical restriction issued by a medical provider." (PPFOF ¶¶ 26–28.)

267. The alternative accommodations provided to Carlson were not possible for Cochrane, and so temporary remote work was the only accommodation available. Furthermore, Cochrane did not request permanent remote work and returned to the office in July 2022. (Catlin Decl. ¶ 84.)

**RESPONSE:** Undisputed that Catlin so declares and that Cochrane returned to the office in July 2022. Disputed that the in-office measures provided to Carlson addressed her limitations: they did not address the fluorescent lighting outside her office or the strong scents and odors her physician identified. DéFort has separately stated that Cochrane's request was approved because it was supported by a "medical restriction issued by a medical provider," although Cochrane had no disability of her own. (PPFOF ¶¶ 26–28, 45, 46, 50.)

268. Carlson is currently the only ALJ working 100% at home. (Hayes Decl. ¶ 15; Catlin Decl. ¶ 85.)

**RESPONSE:** Undisputed.

269. Carlson participates via video conference when all the other ALJs meet in-person on Fridays, which makes it difficult for her to participate, and more importantly, to connect and communicate informally in the workplace with co- workers. (Hayes Decl. ¶ 15.)

**RESPONSE:** Undisputed that Hayes so declares.

270. Because Carlson works completely remote, DéFort continues to have brief one-on-one meetings with her to get a summary of her hearings, address any concerns, and answer any questions that she may have. (DéFort Decl. ¶ 107.)

**RESPONSE:** Undisputed that DéFort so declares.

271. DéFort has weekly one-on-one meetings with Carlson because she is the only ALJ who works 100% remote and her productivity fell before they began meeting. (DéFort Decl. ¶ 108,)

> **RESPONSE:** Undisputed that DéFort holds weekly one-on-one meetings only with Carlson. Disputed as to the reason: when the meetings began in May 2023, Carlson was not working 100% remotely; she was working in the office half of the time and did not begin full-time telework until 2024. DéFort announced the meetings two days after Carlson's May 1, 2023 accommodation request, and in 2023 several in-office ALJs completed fewer decisions than Carlson without being required to attend weekly meetings. (PPFOF ¶¶ 13, 17, 24, 119.)

272. If another ALJ worked 100% remote and presented with similar productivity concerns, DéFort believes that the Administrator would ask DéFort to have one-on-one meetings with him/her. These meetings help to ensure that a 100% remote worker is not completely isolated and remains productive. (DéFort Decl. ¶ 108,)

> **RESPONSE:** Undisputed that DéFort so believes. In 2023, six other Corrections ALJs completed fewer than the 220-revocation-decision goal, and none was required to attend weekly one-on-one meetings. (PPFOF ¶¶ 16, 17, 94.) Carlson does not feel isolated working from home. (PPFOF ¶ 25.)

273. These weekly meetings are beneficial and productive and have helped Carlson's productivity stay on track. (Hayes Decl. ¶ 18.)

**RESPONSE:** Undisputed that Hayes so declares.

274. These meetings are not a disciplinary measure in any way but rather to ensure that Carlson is able to ask any questions and share her work stories and problems with her supervisor as they arise. (Hayes Decl. ¶ 19.)

**RESPONSE:** Undisputed that Hayes so declares.

275. Carlson's productivity has improved since Carlson and DéFort started having regular check-in meetings. Compared to only 111 decisions written in 2022, she wrote 202 decisions in 2023, 230 decisions in 2024, and 243 decisions in 2025. (DéFort Decl. ¶ 109.)

**RESPONSE:** Undisputed as to the number of decisions. Disputed as to the cause; Carlson's output increased after DHA approved her full-time telework in February 2024, and DéFort's 2024 review, covering that period, rated her "Exceptional" as a Corrections ALJ and reported that she had issued more decisions than thirteen of the fifteen Corrections ALJs. (PPFOF ¶¶ 14, 111.)

276. Full-time remote work would create undue hardship, when it was possible to provide reasonable accommodation for in-office work. (Hayes Decl. ¶ 14.)

**RESPONSE:** Disputed. This paragraph is a legal conclusion. DHA has permitted Carlson to work from home full time since February 2024, Corrections hearings are conducted by video, and Hayes's stated reasons concern co-worker resentment and the operations of other hearing units. (PPFOF ¶¶ 4, 9, 14, 18, 146.) DOA's own Justification of Undue Hardship form requires "objective criteria" and states that "[s]ubjective criteria cannot be used," and Defendant has produced no completed justification for any of Carlson's requests. (PPFOF ¶¶ 33, 34.)

277. Allowing some employees to work at home full time while others are required to be in office full time can create resentment and undermine DHA's mutually supportive culture. (Hayes Decl. ¶ 14.)

**RESPONSE:** Undisputed that Hayes so believes.

278. For instance, workers compensation employees had to be 100 percent in office. Those hearings were in person, and the support staff had to be in office to provide due process. (Hayes Decl. ¶ 14.)

**RESPONSE:** Undisputed that Hayes so declares. This paragraph concerns hearing units other than Corrections. (PPFOF ¶ 9.)

279. PASS support staff had to be in office full time to process hearing requests and schedule. (Hayes Decl. ¶ 14.)

**RESPONSE:** Undisputed that Hayes so declares. This paragraph concerns hearing units other than Corrections. (PPFOF ¶ 9.)

280. General Government hearings are often in person and need support staff to help in those hearings. (Hayes Decl. ¶ 14.)

**RESPONSE:** Undisputed that Hayes so declares. This paragraph concerns hearing units other than Corrections. (PPFOF ¶ 9.)

281. Carlson started job searching in 2021, and one of the jobs she applied for had a hybrid 50% telework schedule. (Carlson Dep. 146:20-25; 147:1-4.)

**RESPONSE:** Disputed. The cited testimony does not support this paragraph. Carlson testified that she applied for positions with the Department of Workforce

Development in 2021 or 2022 that were 100% remote, a Department of Children and Families position that she believed was hybrid, and a virtual Social Security Administration position in 2023. (Carlson Dep. 145:9–146:11.)

## State Compensation Plan

282. The State of Wisconsin pays employees in the classified service according to a state Comp Plan, and the Wisconsin Statutes and the Wisconsin Administrative Code (as identified in the Comp plan). (Martin Decl. ¶ 7.)

**RESPONSE:** Undisputed.

283. The Comp plan applies to all classified employees working at DHA. Martha Carlson is classified as an Attorney in the DHA Corrections Hearing Unit (CHU) in Milwaukee. (Martin Decl. ¶ 7.)

**RESPONSE:** Undisputed.

284. The Comp Plan, among other things, sets pay schedules for classified employees, explains how pay is established and maintained for most functions across the enterprise, and specifies if and how wages can increase. (Martin Decl. ¶ 8.)

**RESPONSE:** Undisputed.

285. In very general terms, the Comp Plan is updated by DOA, and state agencies use the compensation information outlined in the Comp Plan (e.g., class pay progression adjustments, market or parity increases for specific classes, compensation provisions for reclassifications of positions, etc.) as biennial operating Comp Plan requests are built for an upcoming biennium to ensure costs get covered. (Martin Decl. ¶ 8.)

**RESPONSE:** Undisputed.

286. During development of the Comp Plan, DOA will solicit state agency input on classifications that may warrant a pay adjustment via the Compensation Plan (e.g., market or parity dollars) to improve pay comparability to positions in the labor market. (Martin Decl. ¶ 8.)

**RESPONSE:** Undisputed.

287. DOA has the discretion to approve or deny all or parts of an agency's Compensation Plan request and considers the recommendations along with DOA staff compensation analyses and available monies for the Compensation Plan as part of the state's compensation reserve. (Martin Decl. ¶ 8.)

**RESPONSE:** Undisputed.

## State Classification Plan

288. All positions in the classified service are assigned to a "classification," also referred to as a "class." DOA's Division of Personnel Management (DPM) is generally responsible for assigning positions to classes, but in some instances, may delegate limited authority to individual agencies to assign positions to classifications where the positions are unique to the agency. (Martin Decl. ¶ 10.)

**RESPONSE:** Undisputed.

289. Positions are assigned to a particular class based on general job duties and are comparable in terms of authority, supervision, responsibilities, and working conditions. Each class has an associated pay schedule and pay range which provides class wage rate parameters. (Martin Decl. ¶ 10.)

**RESPONSE:** Undisputed.

290. All classifications have a class code. A class code is a unique set of digits assigned to each classification (or class) title that is used for personnel and payroll data processing purposes. (Martin Decl. ¶ 11.)

**RESPONSE:** Undisputed.

291. All classifications are also assigned to a pay schedule. (Martin Decl. ¶ 12.)

**RESPONSE:** Undisputed.

292. A pay schedule is a two-digit number designating the designated payment amounts to which the classification is assigned. For example, the "Attorney" classification has a pay schedule of 09. (Martin Decl. ¶ 13.)

**RESPONSE:** Undisputed.

293. A pay range is a number designating the pay range (within the schedule) to which the classification is assigned. Currently, Attorney is assigned to pay range 75. (Martin Decl. ¶ 14.)

**RESPONSE:** Undisputed.

294. Some classifications, such as the Accountant, are part of a classification series. A classification series further categorizes a classification into two or more sub-categories to fluidly allow for movement to a higher class. For example, the Accountant has four levels that are assigned to pay schedule 07 and pay ranges 04, 03, and 02. (Martin Decl. ¶ 15.)

**RESPONSE:** Undisputed.

295. DPM has the authority to create or abolish classifications, reassign positions to different classes, or reassign class pay ranges, to the extent provided in the Wisconsin Statutes and Wisconsin Administrative Code. (Martin Decl. ¶ 16.)

**RESPONSE:** Undisputed.

296. In sum, positions in the classified service have a "class" or "classification" that corresponds with a pay schedule (expressed as a two-digit number) and a pay range (expressed as a different but corresponding two-digit number). (Martin Decl. ¶ 17.)

**RESPONSE:** Undisputed.

297. The pay schedule and pay range correspond with an actual dollar range. Whether, how, and when an employee or class can increase their salary within the range is set by the Comp Plan and associated administrative code provisions. (Martin Decl. ¶ 17.)

**RESPONSE:** Undisputed.

298. State agencies may ask DPM to make changes to the classification plan. (Martin Decl. ¶ 18.)

**RESPONSE:** Undisputed.

299. These changes may include, but are not limited to, creating or eliminating a classification, retitling a classification, changing the specifications in a classification, and reassigning pay ranges. (Martin Decl. ¶ 18.)

**RESPONSE:** Undisputed.

300. DPM typically publishes classification changes to the classification plan in a document titled, "DOA – DIVISION OF PERSONNEL MANAGEMENT COMPENSATION AND CLASSIFICATION BULLETIN," or a similar title. (Martin Decl. ¶ 18.)

**RESPONSE:** Undisputed.

**<u>Setting Compensation at Hiring and Broadbanding</u>**

301. All employees entering the classified service are hired into a specific position that is within a specific classification that has a set pay schedule and range. (Martin Decl. ¶ 19.)

**RESPONSE:** Undisputed.

302. Starting in around 2001, the State of Wisconsin implemented a program called "broadbanding" to address the State's ability to hire within a broader dollar range instead of a single minimum rate. In its simplest terms, broadbanding allows state agencies to pay new employees higher starting salaries when justified by relevant factors. (Martin Decl. ¶ 20.)

**RESPONSE:** Undisputed.

303. Broadbanding occurs when a group of pay ranges are collapsed into one "band." (Martin Decl. ¶ 21.)

**RESPONSE:** Undisputed.

304. For example, one pay band may be classified employees in the classification series 81-04. However, this one classification series covers several non- broad banded pay ranges—ranges 12, 13, 14, and 15; these counterpart pay ranges are defined in WI Human Resources Handbook Chapter 780. (Martin Decl. ¶ 21.)

**RESPONSE:** Undisputed.

305. With broadbanding, the steps within a classification series were abolished. (Martin Decl. ¶ 22.)

**RESPONSE:** Undisputed.

306. For example, a classification series that formerly had multiple levels (also called steps), that were differentiated numerically (e.g., 1, 2, 3, etc.) or by skill level description (e.g., entry, objective, senior, and (at times) advanced, no longer had those steps, or movement options. (Martin Decl. ¶ 22.)

**RESPONSE:** Undisputed.

307. The term "movement" means a change including but not limited to promotion, reclassification, or reallocation. (Martin Decl. ¶ 22.)

**RESPONSE:** Undisputed.

308. Prior to broadbanding, employees could typically obtain salary increases by movement to a higher level (e.g., promotion, reclassification, etc.). (Martin Decl. ¶ 22.)

**RESPONSE:** Undisputed.

309. After broadbanding, with fewer steps or classes within a class series, employees in a broad banded classification had more limited opportunities for salary increases as authorized in the Comp Plan. (Martin Decl. ¶ 22.)

**RESPONSE:** Undisputed.

310. Per Section I – 4.04(2)(a) of the Comp Plan, when a classification has been broad banded, the agency has the discretion to set starting salary at "any rate that is not less than the minimum of the applicable pay range and not greater than the applicable appointment maximum." (Martin Decl. ¶ 23.)

**RESPONSE:** Undisputed.

311. The upside of broadbanding is that it allows the State to better compete for talent with the private labor market by being able to offer a more competitive starting wage. (Martin Decl. ¶ 24.)

**RESPONSE:** Undisputed.

312. The downside of broadbanding is that new employees can have starting salaries higher than the employees who have worked in the agency for longer or were hired to the position classification before the implementation of broad banding. (Martin Decl. ¶ 24.)

**RESPONSE:** Undisputed.

313. If an employee was hired before broad banding went into effect for a specific classification, there is no means within the state compensation system to go back and re-set the salaries of all employees in the class. (Martin Decl. ¶ 25.)

**RESPONSE:** Undisputed.

314. When broadbanding was implemented into any one classification, pay compression typically occurred. Compression is when newer staff are paid similar to or higher than long-term staff. (Martin Decl. ¶ 26.)

**RESPONSE:** Undisputed.

315. Broadbanding often caused pay inequities related to seniority and many long-term employees were upset. (Martin Decl. ¶ 26.)

**RESPONSE:** Undisputed.

316. HR provided consultation to division management on available tools that could be used to better compensate long-term staff without causing greater pay inequities. (Martin Decl. ¶ 26.)

**RESPONSE:** Undisputed.

317. Managers of employees in some classifications did not want to implement broadbanding for this very reason – they did not want to cause strife amongst long-term staff. (Martin Decl. ¶ 27.)

**RESPONSE:** Undisputed.

318. However, because of the classification recruitment and retention issues relating to the demands of the labor market and the need to attract top talent, many classifications moved to broadbanding. (Martin Decl. ¶ 27.)

**RESPONSE:** Undisputed.

**Methods of Receiving Pay Increases in Classified Service**

319. Employees in the classified service may increase their salary or increase their annual compensation in a limited number of ways, as specified in the Comp Plan. (Martin Decl. ¶ 28.)

**RESPONSE:** Undisputed.

320. Reclassification to a class or to a higher level within a classification series that corresponds with a higher pay range. (Martin Decl. ¶ 29.)

**RESPONSE:** Undisputed.

321. For employees who were hired prior to broadbanding, reclassification into a new step within a classification series typically provided for a salary increase. (Martin Decl. ¶ 29.)

**RESPONSE:** Undisputed.

322. Typically, salaries would increase by 8% of the new pay range minimum, or to the minimum of the pay range, whichever was greater. (Martin Decl. ¶ 29.)

**RESPONSE:** Undisputed.

323. However, per Section I – 4.09(2) of the Comp Plan, an agency could request an employee being reclassified receive up to 12% of the new pay range minimum. (Martin Decl. ¶ 29.)

**RESPONSE:** Undisputed.

324. Discretionary Merit Compensation (DMC) is a one-time lump sum payment that does not increase base hourly wage or a base-building adjustment that does increase the base hourly wage. (Martin Decl. ¶ 30.)

**RESPONSE:** Undisputed.

325. Discretionary Equity or Retention Adjustment (DERA) is a permanent increase to an individual's base hourly compensation; the intent is to provide an employee economic recognition to address pay equity or retention needs. (Martin Decl. ¶ 31.)

**RESPONSE:** Undisputed.

326. The Comp Plan, Section I – 6.00(h), provides "Equity DERA will only be approved if the employee's salary has been determined to be lower than that of other state employees performing the same or similar duties at the same level of proficiency and who have comparable years of state service or if there is significant pay compression between the employee and the subordinates supervised." (Emphasis added.) (Martin Decl. ¶ 31.)

**RESPONSE:** Undisputed.

327. Limitations to these criteria are outlined in the Comp Plan. DPM announces when agencies may request DERAs; DPM does not typically accept DERA requests on an ad hoc basis, unless an employee has a written job offer from another employer; in these instances, a Retention DERA can be authorized. (Martin Decl. ¶ 31.)

**RESPONSE:** Undisputed.

328. When DOA/DHA requests from DPM and receives authorization for a Retention DERA for an employee in order to compete with a written job offer from another employer outside of state service, it records those DERAs as being "retention DERAs." (Martin Decl. ¶ 32.)

**RESPONSE:** Undisputed.

329. Otherwise, the DERAs are equity DERA, which are utilized to address pay inequities within a classification. (Martin Decl. ¶ 32.)

**RESPONSE:** Undisputed.

330. The Comp Plan may authorize salary increases for certain classifications. (Martin Decl. ¶ 33.)

**RESPONSE:** Undisputed.

331. These increases are referred to as market or parity provisions in the Comp Plan. (Martin Decl. ¶ 33.)

**RESPONSE:** Undisputed.

332. In some instances, the Comp Plan allows an agency discretion over how to allocate the market dollars to position classifications but in other instances, the Comp Plan requires agencies to apply the market or parity dollars across the board, meaning everyone within a classification receives the same dollar or percentage increase. (Martin Decl. ¶ 33.)

**RESPONSE:** Undisputed.

333. An agency may request seniority stratification for a classification or classifications to give more money to staff based on years of service. The agency must make this request to DPM, who then decides whether to add the request to the Comp Plan that is sent to JCOER for approval. (Martin Decl. ¶ 34.)

**RESPONSE:** Undisputed.

**Attorney classifications**

334. In 2000, broad banding was implemented in the Attorney classification. (Martin Decl. ¶ 35 Ex. 1066, at 1.)

**RESPONSE:** Undisputed.

335. Effective June 4, 2000, DPM reassigned pay ranges for the Attorney Classification as a result of the broadbanding of this classification series. (Martin Decl. ¶ 36 Ex. 1066, at 1.)

**RESPONSE:** Undisputed.

336. The non-broad banded pay ranges for the attorney classification series is 73, 74, and 75 in pay schedule 09 was $16.958, 17.136, and 17.762 minimum and $40.793, 42.953, 44.592 maximum. (Martin Decl. ¶ 37.)

**RESPONSE:** Undisputed.

337. On June 4, 2000 when broadbanding was implemented, the classification went from 3 levels to 1 level and assigned the new broadband pay range 73 in pay schedule 09 was $18.118 minimum and $46.201 maximum. (Martin Decl. ¶ 38.)

**RESPONSE:** Undisputed.

338. Setting pay rates for the Attorney classification after broad banding, division management evaluated a candidate's relevant work experience, training, and education, along with other factors including pay rates of staff in the same job title and their relevant experience/training, internal budget, labor market data, prior positions in state employment, and any other relevant factor. (Martin Decl. ¶ 39.)

**RESPONSE:** Undisputed.

339. After the Attorney classification was broadbanded, agencies had more pay setting flexibility, but the major impact happened after Act 10 was implemented. This limited most unions to only negotiate base wage increases up to the consumer price index (CPI). (Martin Decl. ¶ 40.)

**RESPONSE:** Undisputed.

**Carlson's Pay**

340. The State's Comp plans for 15 years are available on DPM's website. (Martin Decl. ¶ 41 https://dpm.wi.gov/Documents/BCER/Compensation/Section%20Z.pdf.)

**RESPONSE:** Undisputed.

341. Carlson was hired as a new appointment to the CHU Attorney position in DHA effective April 22, 2013, which is the position she currently holds. Carlson had no years of state service prior to her employment as a CHU Attorney in 2013. (Martin Decl. ¶ 43 Ex. 1067, at 1.)

**RESPONSE:** Undisputed.

342. Carlson received pay plan increases in her Attorney position. Carlson received several general wage adjustments including in 2018, 2019, 2020, 2021, 2022, 2023, 2024, 2025, and in 2026. (Martin Decl. ¶ 44 Ex. 1067, at 1.)

**RESPONSE:** Undisputed.

343. There were also a few contractual adjustments including in 2014 and in 2023. There was a "market" adjustment provided in 2019. In addition, there were three "equity" adjustments including in 2018, 2022, and 2026. (Martin Decl. ¶ 44 Ex. 1067, at 1.)

**RESPONSE:** Undisputed.

344. DOA no longer retains the documents related to the 2018 equity adjustment. However, DOA still has the analysis files regarding the 2022 and 2026 awards. Based on the request, the DOA requested four equity adjustments of $0.87 to increase four attorneys. In 2026, the agency also provided a $1.97 equity adjustment. (Martin Decl. ¶ 45 Ex. 1068, at 1-2.)

**RESPONSE:** Undisputed that Martin so declares. Martin did not produce any analysis concerning the equity adjustments Cunningham and Hanson received in 2025, and Carlson received no equity adjustment in 2025. (PPFOF ¶¶ 150, 151.)

345. Jessica Ballenger began her career in state service on January 18, 2011 as an Assistant District Attorney. (Martin Decl. ¶ 46 Ex. 1067, at 2.)

**RESPONSE:** Undisputed.

346. Ballenger was employed as an Assistant District Attorney until February 28, 2021, when she began her employment as an Attorney in the CHU in Milwaukee. (Martin Decl. ¶ 46 Ex. 1067, at 2.)

**RESPONSE:** Undisputed.

347. Ballenger was employed as a CHU Attorney until February 28, 2024, when she returned to her position as an Assistant District Attorney. Ballenger is currently classified as an Assistant District Attorney. (Martin Decl. ¶ 46 Ex. 1067, at 2.)

**RESPONSE:** Undisputed.

348. Ballenger received pay plan increases in her Assistant District Attorney and CHU Attorney. (Martin Decl. ¶ 47 Ex. 1067, at 2.)

**RESPONSE:** Undisputed.

349. In 2021, Ballenger moved into the Attorney classification with a base wage increase of $5.69. In 2022, Ballinger received an "equity" adjustment. In 2023 Ballenger received a GWA and Contractual Wage Adjustment. (Martin Decl. ¶ 47 Ex. 1067, at 2.)

**RESPONSE:** Undisputed.

350. Laura Cunningham began her career in state service on April 30, 2007 as an Assistant State Public Defender Attorney, which is the position she held until June 23, 2018. On June 24, 2018, Cunningham began employment as a CHU Attorney, which is her current position. (Martin Decl. ¶ 48 Ex. 1067, at 3.)

**RESPONSE:** Undisputed.

351. Cunningham received pay plan increases in her Attorney position. (Martin Decl. ¶ 49 Ex. 1067, at 3.)

**RESPONSE:** Undisputed.

352. In 2018, Cunningham moved into an Attorney position for DOA after serving as an Assistant State Public Defender Attorney since 2007. DOA provided an increase of $2.99 base increase. In 2022, 2025, and 2026 Cunningham received "equity" adjustments to recognize state seniority. (Martin Decl. ¶ 49 Ex. 1067, at 3.)

**RESPONSE:** Undisputed.

353. Christine Hanson began her career in state service on January 29, 2001 as an Assistant District Attorney. Hanson held this position until September 15, 2001. On September 16, 2001, Hanson began employment as an Assistant State Public Defender Attorney, a position she held until September 17, 2010. Hanson returned to state service as a CHU Attorney on May 29, 2018, which is her current position. (Martin Decl. ¶ 50 Ex. 1067, at 4.)

**RESPONSE:** Undisputed. DOA's 2026 equity analysis lists Hanson's seniority date as May 6, 2009. (Martin Decl. Ex. 1068, at 1.)

354. Hanson received pay plan increases in her Attorney position. (Martin Decl. ¶ 51 Ex. 1067, at 4.)

**RESPONSE:** Undisputed.

355. Hanson was hired in 2018 after previously serving from 2001 and 2010. The attorney was hired at $39.50. Hanson received several GWAs. Hanson left state service in March 2023, but returned in October 2023. Hanson also received 3 "equity" adjustments starting in 2025. (Martin Decl. ¶ 51 Ex. 1067, at 4.)

**RESPONSE:** Undisputed.

356. DOA Executive HR Manager Rachel Martin is aware that Carlson alleges that she is paid less than Ballenger, Cunningham, and Hanson. (Martin Decl. ¶ 52.)

**RESPONSE:** Undisputed.

357. All of these individuals have more years of state service seniority than Carlson. (Martin Decl. ¶ 52.)

**RESPONSE:** Undisputed.

358. Years of state service is the basis for the available tools HR uses to determine their salary, which explains the higher pay. (Martin Decl. ¶ 52.)

**RESPONSE:** Disputed. Starting pay in the broadbanded Attorney classification is set based on many factors; Ballenger had more years of state service than Carlson but was paid exactly the same rate; and DOA Attorneys with less state service than Carlson were paid the same as or more than Carlson. (PPFOF ¶¶ 147–149.)

**Additional Facts**

359. Carlson admitted that when she goes places outside of work, such as the grocery store, she does not think about whether there are fluorescent lights. (Carlson Dep. 124:2-11.)

**RESPONSE:** Undisputed that Carlson testified she could not say she had ever looked at the grocery store's lighting. Carlson also testified that most restaurants she visits do not have fluorescent lights. (Carlson Dep. 124:2–11.)

360. The fluorescent lights in correctional hearing rooms were no longer an issue after the pandemic because Carlson did not have to travel to correctional institutions. (Carlson Dep. 14:10-12.)

**RESPONSE:** Disputed. The cited testimony states only that Carlson did not travel to correctional institutions after the pandemic shutdown. Fluorescent lighting remained an issue in the State Office Building's hallways, common areas, support staff area, bathrooms, and video hearing room. (Carlson Dep. 14:10–12; PPFOF ¶¶ 39, 45, 46.)

361. On September 28, 2021, Carlson filed a charge of discrimination with the Wisconsin Equal Rights Division (ERD) and the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on disability. (Polich Decl. Ex. 1071, at 1-2.)

**RESPONSE:** Undisputed.

362. In her ERD/EEOC complaint, Carlson alleged that in May 2021, she made an initial request for a reasonable accommodation to work remotely 100% of the time, which was denied on August 20, 2021. (Polich Decl. Ex. 1071, at 2.)

**RESPONSE:** Undisputed.

Dated: November 25, 2026.

*Electronically signed by Nicholas O. Yurk*
Nicholas O. Yurk, SBN: 1095278
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
NYurk@Employee-Advocates.com